[DO NOT PUBLISH]


IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
JULY 16, 2010
JOHN LEY
CLERK

_____

No. 08-16695

_____

D. C. Docket No. 08-20380-CR-CMA

UNITED STATES OF AMERICA,

                                                    Plaintiff-Appellee,

versus

WILLIAM SARDINAS,
JOSE LUIS WONG,
RAYDEL GARCIA DE ARMAS,
RAUL RAMIREZ SOCORRO,

                                                    Defendants-Appellants.


_____

Appeals from the United States District Court
for the Southern District of Florida

_____

(July 16, 2010)

Before O'CONNOR,[*] Associate Justice Retired, CARNES and ANDERSON, Circuit Judges.

PER CURIAM:

This is an appeal arising out of the prosecution of four defendants for crimes involving a plot to commit a home invasion robbery of a drug stash house. The drugs and stash house were fictional constructs that were part of a law enforcement sting operation. The defendants are: Jose Luis Wong, William Sardinas, Raydel Garcia De Armas, and Raul Ramirez Socorro. In varying combinations they challenge their convictions, sentences, or both.

## I.

The following factual account is taken from the evidence introduced during the government's case in chief at the trial of the four defendants.

The High Intensity Drug Trafficking Area Taskforce is a joint operation of the Miami Dade Police Department and the Bureau of Alcohol, Tobacco, Firearms and Explosives. It focuses on violent crimes, including home invasion robberies. The Taskforce sometimes receives information from one of its confidential informants that a group of people is seeking to commit a home invasion robbery for drugs, sometimes also known a "drug rip-off." When the Taskforce receives

---

[*] Honorable Sandra Day O'Connor, Associate Justice (Retired) of the United States Supreme Court, sitting by designation.

such a tip, it typically performs undercover operations to investigate the group and prepare a case for prosecution if the facts justify doing so.

An undercover officer often poses as a disgruntled drug trafficker seeking people to help him commit a robbery in order to steal drugs from one of his employer's stash houses. The confidential informant introduces the undercover agent to the people interested in committing a drug rip-off. The meetings are usually recorded. There usually are no real drugs and no real stash house.

Miguel Gonzalez, a confidential informant working with the Taskforce, offered Wong the opportunity to commit an armed home invasion robbery for drugs. On March 25, 2008, Wong and Gonzalez discussed strategy for carrying out the proposed robbery during a recorded telephone conversation. Wong agreed to bring a partner to meet with Gonzalez and the disgruntled drug trafficker, who was in reality undercover ATF Special Agent Richard Checo.

The next day, Gonzalez and Agent Checo met with Wong and Sardinas in a Sears parking lot. The meeting was audio recorded in its entirety and partially video recorded. Checo told Wong and Sardinas that he transported cocaine for Colombian drug traffickers and that he was responsible for delivering the cocaine to a drug stash house once it arrived in Miami on a freighter. Checo then explained that he wanted to steal the cocaine because the Colombian drug traffickers who

3

employed him had failed to pay him the promised amount for his services.

Checo said that he expected a shipment of twenty to twenty-five kilograms of cocaine to arrive soon. He stated that he would know when the cocaine was to arrive only one day in advance and that he would not know the location of the stash house until he picked up the drugs from the freighter. Wong replied that he understood that his crew would have to be ready at that point. Checo then told Wong and Sardinas that the stash house would be guarded by two men with firearms. Wong told Checo not to worry because three cars full of Wong's people would follow Checo to the stash house.

On April 8, 2008, Wong, Sardinas, Gonzalez, and Agent Checo met again, this time in the parking lot of a Publix supermarket. The Taskforce audio and video recorded the meeting. During that meeting, Wong said, "Everything's ready on my end." He added, "I have the group already, you copy?" Wong also explained the plan: He would not enter the stash house, but his crew would follow Checo inside as Checo delivered the cocaine, catching the armed guards by surprise. Checo told Wong and Sardinas that if they changed their minds, they would have to alert Checo or Gonzalez. Wong and Checo then haggled over how to split the cocaine, eventually agreeing that Wong, Sardinas, and the rest of Wong's crew would receive twenty kilograms and that Checo and his people

4

would receive the remaining five kilograms.

On April 15, 2008, Wong again met with Gonzalez and Agent Checo. The meeting was audio and video recorded. Checo told Wong that the boat containing the cocaine had arrived, and the two agreed that the robbery would occur the following evening. Checo then asked if Wong had everything he needed to commit the robbery, including "hierros." Wong replied, "Everything is ready." (At trial, Agent Checo testified that "hierros" is slang for "firearms.") Checo, while gesturing toward his waistband, told Wong to warn his crew that Checo would have a "hierro" as well. Wong said that he could have his crew together and ready around 3:00 or 4:00 p.m. the next day.

On April 16, 2008, the defendants kept the cellular telephone towers buzzing with activity during the lead-up to the planned heist: Sardinas and De Armas spoke seven times; De Armas and Wong exchanged thirty-one calls; and Socorro spoke to Wong eight times. Cellular tower records indicated that Sardinas, Socorro, and De Armas were in the vicinity of Wong's residence in the late afternoon and evening of April 16. At 7:18 p.m., Gonzalez called Wong and instructed Wong to meet him in the parking lot of the El Tropico Restaurant and to bring his crew with him. The two planned to wait at El Tropico for Agent Checo's call. Once they received it, Gonzalez, Wong, and Wong's crew would drive to

5

meet Checo and then follow him to the fictional stash house where they would carry out the armed robbery.

El Tropico sits next to a Shell gas station. Another restaurant, the Latin American Grill, is located in the immediate vicinity. El Tropico and the area around it were under police surveillance, including video recording, on the evening of April 16, 2008. That evening, Gonzalez waited in the parking lot of El Tropico. He sat in a black Ford Expedition that had been equipped with hidden audio and video recorders.

Just before 9:00 p.m., Wong entered the parking lot of El Tropico and got in the front passenger seat of the Expedition. Wong assured Gonzalez that his people were already in the area surrounding El Tropico. The two discussed how they would travel to the stash house and the planned split of the cocaine. Cellular telephone records revealed that Wong spoke to Sardinas, Socorro, and De Armas while inside the Expedition.

Meanwhile, Detective Mitch Jacobs, a police officer conducting surveillance at the Latin American Grill, observed a red Mustang driven by a female pull into the parking lot of that restaurant. The Mustang parked next to a Toyota Scion containing De Armas and a female passenger. The two vehicles' occupants then spoke to each other. The Mustang and the Scion eventually drove off. They were

6

followed by Detective Jacobs and Detective Wayne Peart.

Back in the Expedition, Wong instructed someone through his cell phone to "go separate ways." Wong then explained to Gonzalez "that they had parked and they had to move. And he's saying that there's a car following them." The Mustang and Scion split up. Detective Jacobs continued following De Armas' Scion as it circled near the area between El Tropico and the Miami Airport.

Wong told Gonzalez that: "[o]ne followed the girl and the other one followed him. And then they told [Sardinas], 'Take off because this is hot.' [Sardinas] took off, and now they're coming back." Wong said into his cell phone: "Brother, because maybe you parked . . . maybe everything . . . is hot, . . . because all the Latin American are super hot." He added, "[D]o me a favor, pick that up. Call me and come to where I'm at . . . . And if you want, you can keep going afterwards . . . but I want that, please. . . . Bring me that." When Wong hung up, Gonzalez asked, "Did he throw away the, the gun?"

Meanwhile, the officers tailing De Armas observed him pull over to the side of an expressway on-ramp. They watched as he walked into a grassy area adjacent to the roadway and apparently searched for something. After a short time, De Armas returned to the Scion and drove away. The officers continued to follow De Armas, and he soon returned to the same location, where he again got out of the

7

Scion and searched for something. The officers then arrested him. While De Armas was in the back of a police car, officers searched the ramp and adjacent grassy area. The officers did not find anything during their search.

Back at El Tropico, officers observed Sardinas enter the parking lot and approach the Expedition. After speaking with Wong and Gonzalez briefly, Sardinas walked back across the parking lot and up to a black Chevy Blazer, which was driven by Socorro. As Sardinas approached, Socorro rolled down the driver side window. The two spoke briefly before Socorro handed a blue gym bag to Sardinas. Sardinas immediately returned to the Expedition, blue gym bag in hand, and entered that vehicle.

After Sardinas climbed inside, the Expedition left the El Tropico parking lot. Gonzalez drove the Expedition to a warehouse, where Wong and Sardinas were arrested. When police officers searched the Expedition, they discovered the blue gym bag. When they opened the bag, they discovered a smaller bag containing a shortened rifle, two silencers, and a magazine clip of ammunition.

After Wong and De Armas had been arrested, officers placed them together in the backseat of a squad car equipped with a recording device. During their recorded conversation, De Armas said, "I told you. I told you. They are going to find my ['cañón'] around there. Shit, fucking-a man!" Wong observed: "And

8

now they are searching where you tossed that." The transcripts introduced into evidence at trial translated the Spanish word "cañón" into English as "gun."

After the Expedition drove away, the Blazer driven by Socorro remained parked for a few minutes. The Blazer soon left the El Tropico parking lot. Officers tailed it and soon stopped the vehicle. Immediately after the officers activated their lights, Socorro jumped out of the Blazer and attempted to flee. He held a cell phone in his hand. When the officers drew their weapons, Socorro got down on the ground. As he was doing so, he furtively tossed his cell phone under the Blazer. The cell phone was introduced into evidence, connecting Socorro to the other defendants.

Each of the defendants gave a post-arrest statement. In his statement, Wong said that he had been instructed by a friend to contact Gonzalez about a proposition regarding cocaine. Wong also admitted to meeting with Agent Checo and Gonzalez and discussing a robbery to get twenty-five kilograms of cocaine from a drug stash house. Wong also admitted that he expected to receive seven kilograms of cocaine from the robbery.

In his post-arrest statement, Sardinas stated that he was asked to bring firearms to the intersection where El Tropico and the Latin American Restaurant are located in order to commit a robbery to get twenty-five kilograms of cocaine.

9

Sardinas admitted that he expected to receive a portion of the cocaine for participating in the robbery. He said that on April 16, 2008, he brought firearms in a blue bag to the El Tropico restaurant in order to commit the robbery; that he met with Gonzalez inside a black Ford Expedition; and he asked Gonzalez if he could show Checo what he had brought, but Gonzalez refused to let him. According to Sardinas, he then retrieved the blue bag containing the firearms from a black Chevy Blazer. Afterwards, he rode with Gonzalez in the Expedition to the location where he was arrested.

De Armas stated in his post-arrest statement that he was contacted on April 15, 2008, about a "proposition" regarding narcotics and that he thought he could make a lot of money from it. According to his statement, De Armas did not know all of the details about the proposition, but he attended a meeting about it at 5:00 p.m. on April 16, 2008. After the meeting, De Armas drove to the parking lot of the Latin American restaurant. While waiting for a phone call there, De Armas learned that there was a meeting about the narcotics proposition taking place nearby. He said that he then left the parking lot and circled around the Miami Airport while waiting on a phone call. De Armas denied possessing a firearm that evening, but admitted that while he was driving he tossed a bag of marijuana out of his car because he thought he was being followed by law enforcement officers.

10

In his post-arrest statement, Socorro stated that sometime after 8:00 p.m. on August 16, 2008, he drove to a gas station at the same intersection as the El Tropico restaurant. According to Socorro, he was asked to participate in a "tumbe" upon arriving at that gas station. Detective Wayne Peart, a native Spanish speaker with eleven years of law enforcement experience dealing primarily with armed home invasion robberies for drugs, testified that "tumbe" is a common Spanish slang word for an armed home invasion robbery for drugs. Socorro also said that he removed a blue bag from his vehicle, left the gas station, and was arrested by law enforcement.

## II.

On July 15, 2008, a federal grand jury in the Southern District of Florida returned a superseding indictment charging Sardinas, Wong, De Armas, and Socorro with conspiracy to obstruct, delay, and affect commerce and the movement of articles and commodities in commerce, by means of robbery (Hobbs Act robbery), in violation of 18 U.S.C. § 1951(a) (Count 1); attempted Hobbs Act robbery, in violation of 18 U.S.C. §§ 1951(a) and 2 (Count 2); conspiracy to possess with intent to distribute five or more kilograms of cocaine, in violation of 21 U.S.C. §§ 846 and 841(a)(1) & (b)(1)(A)(ii) (Count 3); attempted possession with intent to distribute five or more kilograms of cocaine, in violation of 21

U.S.C. §§ 846, 841(a)(1) & (b)(1)(A), and 18 U.S.C. § 2 (Count 4); and carrying and possessing a firearm during and in relation to a crime of violence and a drug trafficking crime, in violation of 18 U.S.C. §§ 924(c)(1)(A), (c)(1)(B)(i–ii), and 2 (Count 5). Wong and Sardinas were also charged with possession of a firearm after a prior conviction of a felony, in violation of 18 U.S.C. §§ 922(g)(1) and 2 (Count 6). Finally, Wong, Sardinas, and Socorro were charged with possession of a firearm that had an obliterated manufacturer's serial number, in violation of 18 U.S.C. §§ 922(k), 924(a)(1)(B), and 2 (Count 7).

All of the defendants were tried by jury, a trial that lasted from August 25, 2008, to September 5, 2008. Wong and Sardinas were found guilty on all seven counts contained in the indictment. They were each sentenced to 600 months imprisonment. Socorro and De Armas were found guilty only on Count 1 of the indictment, for conspiracy to commit Hobbs Act robbery. They were each sentenced to 63 months imprisonment.

### III.

De Armas and Socorro contend that their convictions for conspiracy to commit Hobbs Act robbery should be reversed due to insufficiency of the evidence.[1] Both De Armas and Socorro moved for judgments of acquittal under

---

[1] Socorro attempts to adopt as additional contentions and arguments all of those of his co-defendants. De Armas attempts to adopt all of the arguments of Wong and Sardinas "to the

12

Federal Rule of Criminal Procedure 29(a) after the close of the government's case in chief. The district court reserved ruling on both of those motions, an action which confines our review of the sufficiency of the evidence to that presented in the government's case in chief. See Fed. R. Crim. P. 29(b); United States v. Moore, 504 F.3d 1345, 1347 (11th Cir. 2007).

"We review the sufficiency of the evidence de novo, viewing the evidence in the light most favorable to the verdict." United States v. Thompson, 473 F.3d 1137, 1142 (11th Cir. 2006). "The jury gets to make any credibility choices, and we will assume that they made them all in the way that supports the verdict." Id. In reviewing the sufficiency of the evidence, we must determine whether the jury "reasonably could have found guilt beyond a reasonable doubt." Id. "The evidence need not exclude every hypothesis of innocence or be completely inconsistent with every conclusion other than guilt because a jury may select among constructions of the evidence." United States v. Bailey, 123 F.3d 1381, 1391 (11th Cir. 1997).

"The Hobbs Act prohibits robbery or extortion, and attempts or conspiracies

---

extent applicable." Our rules, however, require that "[a] party who adopts by reference any part of the brief of another party pursuant to FRAP 28(i) shall include a statement describing in detail which briefs and which portions of those briefs are adopted." 11th Cir. R. 28-1(f). Because De Armas and Socorro have not complied with that requirement, they have not properly adopted any argument of their co-defendants.

to commit robbery or extortion, that in any way or degree obstruct, delay, or affect commerce or the movement of any article or commodity in commerce." United States v. Diaz, 248 F.3d 1065, 1084 (11th Cir. 2001) (quotation marks, alterations, and citation omitted). To prove Hobbs Act conspiracy, "the government must prove that: (1) two or more persons agreed to commit a robbery or extortion encompassed within the Hobbs Act; (2) the defendant knew of the conspiratorial goal; and (3) the defendant voluntarily participated in helping to accomplish the goal." Id. In order to prove the existence of a conspiracy, "[t]he government is . . . not required to demonstrate the existence of a formal agreement, but may instead demonstrate by circumstantial evidence a meeting of the minds to commit an unlawful act." United States v. Arias-Izquierdo, 449 F.3d 1168, 1182 (11th Cir. 2006) (quotation marks and citation omitted). When the government bases its case on circumstantial evidence, "reasonable inferences, and not mere speculation, must support the jury's verdict." United States v. Perez -Tosta, 36 F.3d 1552, 1557 (11th Cir. 1994).

**A.**

De Armas contends that the government presented no evidence demonstrating that he knew that the goal of the conspiracy was a robbery, rather than some other type of drug transaction. While "the government need not prove

14

that a defendant had knowledge of all details or phases of a conspiracy," it must prove "that the defendant knew the essential nature of the conspiracy." United States v. Payne, 750 F.2d 844, 859 (11th Cir. 1985). The government failed to produce evidence showing that De Armas possessed that knowledge.

The government makes much of the fact that De Armas admitted in his post-arrest statement that he attended a meeting about a "proposition relating to narcotics." Standing alone, however, De Armas' ambiguous post-arrest admission that he attended a meeting about a "narcotics proposition" but did not know all the details is insufficient under our precedent to prove beyond a reasonable doubt that he knew a robbery, instead of some other drug-related crime, was being planned. See United States v. Charles, 313 F.3d 1278, 1286 & n.6 (11th Cir. 2002); United States v. Hamblin, 911 F.2d 551, 558 & n.4 (11th Cir. 1990).

The government argues that other evidence makes it clear that De Armas knew that the proposition involved armed robbery. The "other evidence" on which the government relies to argue that a reasonable jury could infer that De Armas knew that the proposition involved robbery includes: (1) the taped meetings between Gonzalez, Agent Checo, Sardinas, and Wong during which Wong agreed to assemble a team to commit the armed robbery; (2) the large number of telephone calls between De Armas and the other defendants on the evening of April 16; (3)

15

the cellular site records indicating that De Armas was in the immediate vicinity of Wong's apartment on April 16 before traveling to the vicinity of El Tropico; and (4) De Armas' and Wong's post-arrest conversation in the backseat of a police cruiser regarding a gun.

The government's argument does not convince us in light of United States v. Martinez, 83 F.3d 371 (11th Cir. 1996). De Armas' situation in this case is similar to the situation of one of the defendants, Gomez, in the Martinez case. And we reversed Gomez's conviction for conspiracy to possess, and possess with intent to distribute, cocaine. Id. at 374. We did so despite the following facts: (1) the co-defendant organizing the armed robbery at a cocaine stash house told an undercover officer that he "had men with guns ready to steal this 50 kilograms of cocaine;" (2) Gomez was present, albeit in a different vehicle, when the lead defendant met in a parking lot with an undercover officer to plan the robbery; (3) Gomez rode with the lead defendant to the house where the cocaine was stored; (4) Gomez approached the house holding a handgun and broke in using a crowbar; and (5) Gomez was arrested upon leaving the stash house carrying a suitcase containing cocaine. Id. at 373. Gomez claimed he believed that the object of the conspiracy was to steal money. Id. at 374. We reversed Gomez's conviction because we "found no evidence proving that Gomez knew he was going to the house to steal

16

cocaine." Id. We rejected the government's argument that the lead defendant's statement that he had "men and guns ready" was sufficient to prove that Gomez knew that the object of the conspiracy was to steal cocaine. Id.

Just as Gomez's degree of involvement in the planned heist in Martinez was insufficient to prove he knew that the object of the conspiracy was to steal cocaine, De Armas' level of involvement in the planned heist in this case is insufficient to prove he knew that the object of the conspiracy was a robbery. De Armas was not present at any of the meetings with Gonzalez or Agent Checo. He did not go to the location of the fictitious stash house, much less break into the house with a crow bar and leave with a suitcase full of cocaine, as Gomez had in Martinez. Just as the lead defendant's statement that he had "men and guns ready" did not show that Gomez knew the goal of the Martinez conspiracy was to steal cocaine, id., Wong's statements, including his statement to Gonzalez on the evening of April 16 that his people were "already in position," do not show that De Armas knew that the goal of the conspiracy was to commit a robbery. That is especially true in light of the fact that Wong told Checo and Gonzalez on the day before the planned robbery that "everyone knows only what they have to know."

While a reasonable jury could infer from De Armas' police car conversation with Wong that De Armas possessed a gun on the evening on which the robbery

17

was to occur, that alone is not enough to prove that De Armas was aware that the "narcotics proposition" involved robbery, as opposed to some other type of transaction involving narcotics. The drug trade is a messy, violent business that often involves the presence of weapons, even at the scene of consensual transactions. As we have said before, "[i]t is uniformly recognized that weapons are often as much 'tools of the trade' as the most commonly recognized narcotics paraphernalia." United States v. Terzado-Madruga, 897 F.2d 1099, 1120 (11th Cir. 1990); see also United States v. Wiener, 534 F.2d 15, 18 (2nd Cir. 1976) ("Experience . . . has taught that substantial dealers in narcotics keep firearms . . . as tools of the trade."). In fact, Agent Checo testified that, in constructing the fictitious scenario, he portrayed himself as a drug dealer "surrounded by men who are armed" in order "to make [the scenario] realistic." From this record, the government cannot show that Wong, or anyone else, ever informed De Armas that the object of the conspiracy was to commit a robbery, and for that reason under Martinez we must reverse his Hobbs Act robbery conviction. See Martinez, 83 F.3d at 374.

**B.**

Socorro contends that the government failed to present evidence establishing that he knew that the object of the planned robbery was cocaine. That argument

18

does not fly true. Socorro admitted in his post-arrest statement that on April 16, 2008, he was invited to participate in a "tumbe." Detective Peart testified that "tumbe" is a common Spanish slang word for an armed home invasion robbery for drugs. Peart is a native Spanish speaker with eleven years of law enforcement experience, and ninety-five percent of the cases handled by his unit involve armed home invasion robberies for drugs. The jury was entitled to credit his testimony. See United States v. Hewitt, 663 F.2d 1381, 1386 (11th Cir. 1981) (stating that we must accept the jury's credibility determination unless the testimony at issue is "incredible as a matter of law"). The government therefore presented sufficient evidence to prove that Socorro knew that the object of the conspiracy was a robbery with the goal of stealing cocaine. Because the government presented sufficient evidence that Socorro knew the object of the conspiracy, his situation differs from that of De Armas.

Socorro also argues that, even if the government produced evidence proving he knew of the conspirational objective, it did not prove that he "voluntarily participated in helping to accomplish the goal." Diaz, 248 F.3d at 1084. While admitting that he said in his post-arrest statement that he had been invited to participate in a "tumbe" upon arrival at a gas station located at the same intersection as the El Tropico, Socorro argues that "nothing he was observed doing

19

afterwards demonstrated his knowing participation in the conspiracy." In other words, he argues that the government did not prove he accepted the invitation to participate in the robbery.

We disagree. Socorro concedes that he spoke with Wong over the telephone eight times on the day the rip-off of the stash house was to occur. At least five of those calls were made after Socorro arrived in the parking lot of El Tropico, with the final phone call between Socorro and Wong occurring at 10:04 p.m., just minutes before Wong's arrest. Socorro remained in the El Tropico parking lot until a few minutes after the Expedition containing Gonzalez, Sardinas, and Wong left to transport Sardinas and Wong to a warehouse, where Sardinas and Wong believed they would meet with Checo before following him to the stash house. While "presence and association with others at the time of the commission of an offense is not sufficient" to sustain a conspiracy conviction, "presence and association are factors to be considered with other evidence in evaluating the 'totality of the circumstances' by which a jury can determine whether a defendant is guilty." United States v. Bell, 833 F.2d 272, 275 (11th Cir. 1987) (quoting United States v. Blasco, 702 F.2d 1315, 1332 (11th Cir. 1983)).

In Socorro's case, the totality of the circumstances include more than his presence and the highly suspicious phone calls. First, it was Socorro who handed

the gym bag containing the shortened rifle, ammunition, and two interlocking silencers to Sardinas, who then returned with the bag to the Expedition where Wong and Gonzalez were. A reasonable jury could conclude beyond a reasonable doubt that a person in possession of a bag containing weapons of the type found in the blue gym bag knew of the presence of those weapons in the bag. Cf. United States v. Quilca-Carpio, 118 F.3d 719, 722 (11th Cir. 1997) ("A reasonable jury could infer from the quantity of drugs seized that a 'prudent smuggler' is not likely to entrust such valuable cargo to an innocent person without that person's knowledge."). The act of delivering those weapons to Sardinas furthered the armed robbery scheme, and a defendant's voluntary participation in a conspiracy "can be inferred from evidence that the defendant took action that furthered the conspiracy." United States v. Cooper, 873 F.2d 269, 272 (11th Cir. 1989).

Not only that, but there is also the fact that as soon as his vehicle was pulled over, Socorro got out and attempted to flee. He stopped only when the officers pulled their weapons, at which point Socorro lowered himself to the ground and furtively tossed under his vehicle the cell phone that linked him to his co-defendants. The jury could reasonably infer from Socorro's attempt to flee and act of concealment his consciousness of guilt, and therefore his guilt. See United States v. McDowell, 250 F.3d 1354, 1367 (11th Cir. 2001); United States v.

21

Blakey, 960 F.2d 996, 1000 (11th Cir. 1992). Viewed in the light most favorable to the government, the evidence suffices to support the jury's verdict that Socorro knowingly and voluntarily participated in the conspiracy to commit armed robbery at a stash house in an effort to obtain drugs. Diaz, 248 F.3d at 1084.

## IV.

Wong raises two issues related to his examination of Gonzalez, the confidential informant. The government did not call Gonzalez as a witness, but Wong called him as a hostile witness. Wong contends that the government violated his constitutional rights by failing to provide him with information that he argues was necessary to effectively interrogate Gonzalez.

Before trial Wong filed a motion to compel discovery of information about the confidential informant including, among other things, his identity, communications with law enforcement officers, aliases, criminal history, and history of acting as a cooperating witness or confidential informant. Wong also sought information related to the informant's credibility, health, or substance abuse.

The district court denied Wong's motion to compel. It reasoned that disclosure of the requested information was not required because the government did not intend to call Gonzalez as a witness and because Wong had failed to make

the necessary showing to overcome the "informer's privilege." Soon after that, it became apparent that the defendants, including Wong, knew the confidential informant's identity. Any doubt about whether the defendants knew that fact was removed when the government turned over to the defendants the tapes of the recorded conversations and meetings; Gonzalez identified himself at the beginning of several of those recordings. During a pretrial evidentiary hearing Wong renewed his motion to compel disclosure about the informant on the ground that the informant's testimony would be relevant to Wong's entrapment defense. The district court ordered the government to make the confidential informant available so that the defense could put him on the witness stand. The court refused, however, to order the government to make disclosures of impeachment evidence about Gonzalez, again reasoning that those disclosures were unnecessary because the government was not going to call him as a witness.

During the trial Wong again asked the court to require the government to turn over Gonzalez's criminal record so that Wong could impeach him with it. The district court then ordered the government to provide Wong with Gonzalez's date of birth so that the defense could research Gonzalez's criminal record. The government did so. A day after doing that, the government produced Gonzalez so that the defense could interview him. Wong's counsel tried to do so but Gonzalez

23

refused to answer any question that went beyond his date of birth.

At that point, Wong requested any information in the government's possession regarding an alleged early 2008 effort on the part of Gonzalez and the North Miami Beach Police Department to sell Wong cocaine as part of a sting operation. He also sought confirmation of whether Gonzalez was on probation following a conviction for illegal gambling. The government agreed that it would review the ATF files, for the second time, in search of any information concerning the alleged investigation, but argued that it should not have to disclose whether Gonzalez was serving a term of probation because Wong, not the government, was calling Gonzalez as a witness.

At that point, Wong explained that he did not know Gonzalez's social security number and did not have access to the National Crime Information Center's report concerning Gonzalez, and he asserted that without that information he would only be able to properly investigate Gonzalez following his testimony. Wong told the district court that he would therefore need an approximately month-long recess after Gonzalez testified to conduct further investigation. The district court encouraged the government to provide the requested information, stating that if the government did not, the court would grant Wong's counsel the recess. The government complied, and Wong's counsel used that information to investigate

24

Gonzalez.

At trial Wong called Gonzalez as an adverse witness. During his testimony, Gonzalez discussed his long career as an informant for several government agencies, including the ATF. Gonzalez testified that he had received more than $150,000 for his work as an informant, and that his work as an informant was more or less his sole source of income. He also admitted that he generally receives no compensation for his work as an informant when no arrests are made. Gonzalez admitted that he had not paid taxes on the compensation he received from the government for his work as an informant, despite being told that he must do so, and that he had not been prosecuted for his failure to pay taxes. He disclosed that he had also received early release from prison in exchange for his work as an informant.

Gonzalez testified to at least four aliases unrelated to his work for the government. He also admitted at least eight prior convictions, including convictions for seven different crimes: 1) giving the police a false name; 2) grand theft; 3) conspiracy to commit fraud; 4) uttering forged instruments; 5) robbery; 6) burglary; and 7) counterfeiting. Gonzalez testified that he had violated the terms of his probation or supervised release on several occasions. He admitted using drugs. Finally, Gonzalez testified about his effort to make a case against Wong during late

25

2007 and early 2008.

## A.

Wong's first contention is that his Due Process rights were violated because the government failed to satisfy its obligations to disclose "the informant's full identity, as well as impeaching and exculpatory evidence concerning the informant." Wong frames this contention in terms of the "informer's privilege" doctrine.

This is not a standard informer's privilege case because the identity of the confidential informant was not confidential. Wong not only knew early on that Gonzalez was the informant, but he was also provided with Gonzalez's birth date and, ultimately, with the National Crime Information Center Report on Gonzalez. Nevertheless, because Wong has framed his argument in terms of the informer's privilege, we will analyze his argument using that framework. See United States v. McDonald, 935 F.2d 1212, 1217 (11th Cir. 1991).

The informer's privilege "is in reality the Government's privilege to withhold from disclosure the identity of" government informants. Roviaro v. United States, 353 U.S. 53, 59, 77 S.Ct. 623, 627 (1957). That privilege is not absolute, and "in determining when the government's privilege must give way to a defendant's right to prepare his defense, a court must engage in a balancing test,

26

taking into account the particular circumstances of each case, the crime charged, possible defenses, and the potential significance of the informant's testimony." United States v. Gutierrez, 931 F.2d 1482, 1490 (11th Cir. 1991). If disclosure is "relevant and helpful to the defense of an accused, or is essential to a fair determination of a cause, the privilege must give way." Roviaro, 353 U.S. at 61, 77 S.Ct. at 628. As Wong concedes, we review a district court's refusal to order disclosure of information relating to a confidential informant only for an abuse of discretion. United States v. Parikh, 858 F.2d 688, 696 (11th Cir. 1988).

A defendant may succeed in overcoming the government's assertion of the informer's privilege "if he can prove that the informant's probable testimony would bear a direct relationship on the defendant's asserted defense." McDonald, 935 F.2d at 1217. At trial, Wong asserted the defense of entrapment. Gonzalez was in a "unique position to affirm or deny" Wong's allegations that he was entrapped. Id. (citations and quotation marks omitted).

Still, Wong's informer's privilege contention fails. A criminal defendant challenging his conviction on the ground that the district court erred by refusing to order disclosure relating to a confidential informant must demonstrate that he suffered prejudice due to that error. See id. at 1217–18. Wong did not suffer prejudice in any way. He knew all that he was entitled to know, and before the

27

trial was over he knew all there was to know.

The government made Gonzalez available for Wong to call him as a witness. Wong did so, and on the stand Gonzalez divulged a mass of information calling into question his own credibility. Gonzalez's testimony included a detailed discussion of, among other things, his own extensive criminal history, his lengthy career as a government informant, the large sums of money he had been paid for that work, and the fact that he had received early release from prison in exchange for it. He admitted that his work as an informant was essentially his sole source of income and that if no one was arrested as a result of his efforts, he did not get paid. In short, Gonzalez gave Wong the impeachment evidence he was seeking.

While testifying, Gonzalez also discussed his previous efforts to make a case against Wong in late 2007 and early 2008. Wong was given a full opportunity to ask Gonzalez under oath about that matter and any other communications between Gonzalez and the government. In light of Gonzalez's extensive testimony concerning the very matters that were the subjects of Wong's disclosure requests, Wong has failed to demonstrate how the district court's refusal to order the government to disclose additional information related to the informant prejudiced in any way his examination of Gonzalez or his presentation of his entrapment defense. See id. at 1218.

28

To the extent Wong argues that the government failed to produce Gonzalez, or to disclose information concerning him, in time for Wong to further investigate him before trial, Wong waived any objection he might have had as to the timeliness of the government's actions by failing to raise an objection or request a continuance following Gonzalez's testimony. See id. The absence of a request for a continuance is especially glaring in light of the district court's indication that it might be willing to grant one if Wong felt that he had not been able to adequately investigate Gonzalez. More importantly, Wong has not demonstrated that he was in any way prejudiced by the government's failure to disclose any additional information about Gonzalez earlier than it did. See id. The record indicates, if anything, that Wong was not prejudiced at all by the timing of the disclosure. There was no abuse of discretion in any of the district court's rulings regarding the information about Gonzalez.

**B.**

Wong's second issue or contention involving Gonzalez, made by way of adopting an argument from De Armas' brief, is that the district court restricted the scope of his examination of Gonzalez as an adverse witness in violation of his rights under the Confrontation Clause of the Sixth Amendment. The theory of this contention is that Wong should not have been forced to confront Gonzalez without

the information requested in Wong's Motion to Compel Discovery About Cooperating Witness.

The Confrontation Clause provides that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him." U.S. Const. amend. VI. "The main and essential purpose of confrontation is to secure for the defendant the opportunity of cross-examination." United States v. Baptista-Rodriguez, 17 F.3d 1354, 1366 (11th Cir. 1994) (alterations omitted) (quoting Delaware v. Van Arsdall, 475 U.S. 673, 678, 106 S.Ct. 1431, 1435 (1986)). "The [S]ixth [A]mendment right to cross-examination is not strictly limited to the confrontation of witnesses called by the state; it also extends to defense witnesses who testify adversely to the defendant." Wasko v. Singletary, 966 F.2d 1377, 1381 (11th Cir. 1992).

In Pennsylvania v. Ritchie, 480 U.S. 39, 107 S.Ct. 989 (1987), a plurality of the Supreme Court rejected an argument similar to the one Wong makes here. The Ritchie plurality wrote:

> The opinions of this Court show that the right to confrontation is a trial right, designed to prevent improper restrictions on the types of questions that defense counsel may ask during cross-examination. The ability to question adverse witnesses, however, does not include the power to require the pretrial disclosure of any and all information that might be useful in contradicting unfavorable testimony. Normally the right to confront one's accusers is satisfied if defense counsel receives

30

> wide latitude at trial to question witnesses. In short, the Confrontation Clause only guarantees an opportunity for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, the defense might wish.

Id. at 52, 107 S.Ct. at 999 (citations, emphasis, quotation marks, and footnote omitted). The Ritchie plurality closed that portion of its opinion by concluding that there had been no violation of the Confrontation Clause, despite the trial court's refusal to order disclosure of the requested information, "[b]ecause defense counsel was able to cross-examine all of the trial witnesses fully." Id. at 54, 107 S.Ct. at 1000. Likewise, because the district court placed no limits on Wong's examination of Gonzalez, there was no Confrontation Clause violation.

Even if a district court's refusal to order the disclosure of information about a witness could be characterized as a limitation on the scope of cross-examination of that witness, Wong's argument would still fail. A defendant does not enjoy an unlimited right to engage in cross-examination, and "[o]nce there is sufficient cross-examination to satisfy the Sixth Amendment's Confrontation Clause, further questioning is within the district court's discretion." United States v. Garcia, 13 F.3d 1464, 1468 (11th Cir. 1994). "The Confrontation Clause is satisfied 'when the defense is given a full and fair opportunity to probe and expose . . . infirmities through cross-examination, thereby calling to the attention of the factfinder the

31

reasons for giving scant weight to the witness' testimony.'" Dorsey v. Chapman, 262 F.3d 1181, 1188 (11th Cir. 2001) (quoting Delaware v. Fensterer, 474 U.S. 15, 22, 106 S.Ct. 292, 295 (1985)).  In other words, "[t]he sixth amendment confrontation clause is satisfied where sufficient information is elicited from the witness from which the jury can adequately gauge the witnesses' credibility." United States v. Burke, 738 F.2d 1225, 1227 (11th Cir. 1984).  During his time on the stand, Gonzalez revealed more than enough information to allow the jury to gauge his credibility.  There was no error.

## V.

As part of its case in chief, the government played audio and video tapes of various recorded conversations.  Because those conversations were primarily in Spanish, the government also introduced into evidence transcripts containing translations of them.  One half of each page of the transcripts reproduced the transcribed conversation verbatim in Spanish, and the other half contained an English translation.  Drafts of the transcripts, including the English translations, were produced by transcribers working for the Taskforce.  After the transcribers produced those drafts, Agent Checo, a life-long Spanish speaker, listened to the recorded conversations and made corrections to every draft transcript.  Agent Checo had the final word on the content of the transcripts, including the English

32

translations.

Again adopting an argument from De Armas' initial brief, Wong contends that his Sixth Amendment Confrontation Clause rights were violated because the transcribers who produced the original drafts of the transcripts did not testify during the trial and were therefore not subject to cross-examination.

Because this issue was not raised in the district court, we review it only for plain error. United States v. Ternus, 598 F.3d 1251, 1254 (11th Cir. 2010). A defendant seeking to establish plain error "must show there is (1) error, (2) that is plain, and (3) that affects substantial rights." United States v. Moriarty, 429 F.3d 1012, 1019 (11th Cir. 2005). If the defendant meets all three of those requirements, "we may exercise our discretion to recognize a forfeited error, but only if the error 'seriously affects the fairness, integrity or public reputation of judicial proceedings.'" Id. (quoting United States v. Olano, 507 U.S. 725, 732, 113 S.Ct. 1770, 1776 (1993)).

A defendant's right under the Sixth Amendment "to be confronted with the witnesses against him," U.S. Const. amend. VI, is violated by the introduction of out-of-court testimonial statements of a witness who does not appear at trial unless the witness is unavailable and the defendant had a prior opportunity to cross-examine her. Crawford v. Washington, 541 U.S. 36, 68, 124 S.Ct. 1354, 1374

(2004). In <u>Melendez-Diaz v. Massachusetts</u>, __U.S.__, 129 S.Ct. 2527 (2009), the Court held that affidavits reporting the results of forensic tests fell into the "core class of testimonial statements" covered by the Confrontation Clause, rendering the analysts who created them witnesses against the defendant with whom the defendant had a right to be confronted. <u>Id.</u> at 2532. Wong argues that the transcripts at issue in this appeal are similar to the substance identification affidavits in <u>Melendez-Diaz</u>, and that the transcribers who created the original drafts are therefore witnesses against him with whom he had a right to be confronted.

Even assuming that the transcripts fall into the "core class of testimonial statements" under <u>Crawford</u> and <u>Melendez-Diaz</u>, Wong's argument fails because he has not shown error. <u>See</u> <u>Moriarty</u>, 429 F.3d at 1019. Agent Checo, who reviewed the recordings himself, had the ultimate say over the content of the transcripts, making him the final translator. He is thus the witness against Wong for Confrontation Clause purposes. Agent Checo testified that the transcripts "fairly and accurately depict the events and conversations that took place in this case." Moreover, he was subjected to an extensive cross-examination spanning more than 170 pages of transcript. Wong was "confronted with the witness[]" against him," U.S. Const. amend. VI, and the Confrontation Clause requires no

34

more. Therefore, Wong's rights under Confrontation Clause were not violated by the fact that transcribers who produced the raw drafts from which Checo produced the final transcripts did not testify. Cf. Melendez-Diaz, __U.S.__, 129 S.Ct. at 2532 n.1 ("[W]e do not hold, and it is not the case, that anyone whose testimony may be relevant in establishing the chain of custody, authenticity of the sample, or accuracy of the testing device, must appear in person as part of the prosecution's case.").

Even if the government's failure to call the original transcribers constituted error, it was not plain. See Moriarty, 429 F.3d at 1019. "An error is plain if it is obvious and clear under current law." United States v. Eckhardt, 466 F.3d 938, 948 (11th Cir. 2006); see also Puckett v. United States, __U.S.__, 129 S.Ct. 1423, 1429 (2009) (In order to qualify as plain error, "the legal error must be clear or obvious, rather than subject to reasonable dispute."). Wong cites no caselaw supporting his position that his rights under the Confrontation Clause were violated by the fact that the transcribers who produced the original drafts did not appear along with the person who was responsible for the final transcript. The Supreme Court has not addressed the issue, and neither have we. In fact, it does not appear that any of our sister circuits have resolved the issue either, although one of them has held that no violation of the Confrontation Clause occurred in a similar

35

situation involving lab technicians.  See United States v. Turner, 591 F.3d 928, 933–34 (7th Cir. 2010).  Given the lack of precedent directly resolving Wong's argument on this point in his favor, we conclude that, even if the absence of testimony from the initial transcribers constituted error, that error was not plain.  See United States v. Humphrey, 164 F.3d 585, 588 (11th Cir. 1999).

Finally, even if Wong has shown error that is plain, he has not demonstrated that his substantial rights were affected.  See Moriarty, 429 F.3d at 1019.  In order to show that his substantial rights were affected, a defendant must show that the error was prejudicial, in that there exists "a reasonable probability that the error affected the outcome of the trial."  United States v. Marcus, No. 08-1341, 2010 WL 2025203, at *3 (U.S. May 24, 2010).  Wong has made no such showing.  He has failed to explain how cross-examining the translators who compiled the drafts that were corrected and ultimately verified by Agent Checo could possibly have changed the outcome of the trial.  We doubt that he could make such a showing, given that Agent Checo made the ultimate decisions concerning the content of the transcripts and was subject to extensive cross-examination.  Moreover, Wong has pointed us to no evidence that the transcripts were inaccurate, and indeed may well have waived the opportunity to challenge the accuracy of the transcripts by failing to follow the procedures we have established for making such a challenge.  See

36

United States v. Le, 256 F.3d 1229, 1238 (11th Cir. 2001); United States v. Cruz, 765 F.2d 1020, 1023 (11th Cir. 1985). In any event, we need not rely on waiver here, because Wong has failed to satisfy the first three necessary preconditions for relief under plain error review. See Moriarty, 429 F.3d at 1019.

## VI.

Sardinas and Wong challenge their sentences. In reviewing a district court's sentencing determination, we review the factual findings that underlie the sentence only for clear error. United States v. Docampo, 573 F.3d 1091, 1096 (11th Cir. 2009). We review de novo the application of the Sentencing Guidelines to those facts. Id.

Both Wong and Sardinas argue that the government engaged in impermissible sentencing factor manipulation. In considering a claim of sentencing factor manipulation, we must ask "whether the manipulation inherent in a sting operation, even if insufficiently oppressive to support an entrapment defense, or due process claim, must sometimes be filtered out of the sentencing calculus." United States v. Sanchez, 138 F.3d 1410, 1414 (11th Cir. 1998) (citation, emphasis, and quotation marks omitted). Our focus in evaluating a claim of sentencing factor manipulation is on the government's conduct. Id.

In order to show that the government's conduct is "sufficiently

37

reprehensible" to support a claim of sentencing factor manipulation, the defendant must show that the government engaged in "extraordinary misconduct." United States v. Ciszkowski, 492 F.3d 1264, 1271 (11th Cir. 2007). That is a high bar. In fact, the bar is so high that "[w]e have not yet recognized a defense of sentencing factor manipulation or permitted its application to a defendant's sentence." Docampo, 573 F.3d at 1097–98. Even if a sentence can be reduced based on sentencing factor manipulation, neither Wong nor Sardinas has made the showing of "extraordinary governmental misconduct" that we have suggested might warrant the application of the defense. See id. at 1098.

## A.

Sardinas was convicted on all seven counts contained in the indictment and sentenced to a total of 50 years imprisonment. He asks us to vacate the 30-year sentence of imprisonment imposed on him for his conviction on Count 5, which charged him with carrying and possessing a firearm during and in relation to a crime of violence and a drug trafficking crime, in violation of 18 U.S.C. §§ 924(c)(1)(A), (c)(1)(B)(i–ii), and 2. Section 924(c)(1) provides in pertinent part that:

> any person who, during and in relation to any crime of violence or drug trafficking crime . . . uses or carries a firearm, or who, in furtherance of any such crime, possesses a firearm . . . [shall be sentenced to a term of imprisonment of not less than thirty years] if

38

> the firearm involved . . . is equipped with a firearm silencer or firearm
> muffler . . . .

18 U.S.C. § 924(c)(1)(A), (B)(ii).

Sardinas argues that there is "no evidence that he ever contemplated the use of a rifle and silencer or any other weapon to accomplish the theft of the drugs." That argument is contradicted by his post-arrest statement in which Sardinas admitted that he brought firearms in a blue bag to El Tropico in order to commit the armed robbery.

Sardinas asserts that the government provided him with the gym bag containing the shortened rifle and silencers. Even if it did, that fact alone would not be enough to establish sentencing factor manipulation. See Ciszkowski, 492 F.3d at 1271 ("The fact that law enforcement may provide drugs or guns essential to a willing and predisposed offender does not necessarily constitute misconduct."). But Sardinas goes beyond that and asserts that the government arranged for the short-barreled rifle and silencers to be placed inside the gym bag without his knowledge. He emphasizes that the record contains no evidence that he actually looked inside the gym bag. The absence of evidence does not help him, however, because it is his burden to establish sentencing factor manipulation. Because Sardinas has not shown that the rifle and silencers were put into the bag at the behest of the government and without his knowledge, he has not established the

"sufficiently reprehensible" and "extraordinary misconduct" that we have theorized would support a claim of sentencing factor manipulation. See id.

**B.**

Wong, like Sardinas, contends that the government engaged in impermissible sentencing factor manipulation. Wong was found guilty on all seven counts and sentenced to fifty years imprisonment. His fifty-year sentence was the result of three statutory mandatory minimums: two concurrent twenty-year sentences for conspiring and attempting to possess with intent to distribute five or more kilograms of cocaine, see 21 U.S.C. § 841(b)(1)(A); and a thirty-year one, to run consecutively to his other terms of imprisonment, for carrying and possessing a firearm during and in relation to a crime of violence or a drug trafficking crime. See 18 U.S.C. § 924(c)(1)(B)(ii).

Wong's position is that the district court could and should have refused to apply the statutory mandatory minimum sentences because the government engaged in improper sentencing factor manipulation. He asserts that the district court found improper sentencing factor manipulation but believed it could do nothing to remedy it. Wong quotes this statement of the district court at his sentencing: "If I had discretion [to refuse to impose the mandatory minimum sentences], I would exercise it, but I do not have discretion." Our reading of that

40

statement in context convinces us that the court was stating that the facts of the case did not show sentencing factor manipulation, not that it existed but could not be remedied. The district court found that the government did not engage in impermissible sentencing factor manipulation. That finding was not tainted by any clearly erroneous fact findings or by any misunderstanding of the law.

Wong insists that the government engaged in sentencing factor manipulation by encouraging him to secure a gun and other people to participate in the planned robbery. According to Wong, the government encouraged him to do those things by constructing the scenario so that he would believe there were formidable armed guards at the stash house and would think he needed weapons and help in carrying out the armed robbery. The government agents who testified at trial stated that they included elements of danger in the fictitious scenario in order to make the story realistic and believable. Sting operations must be believable to be effective, and, as we have explained, "[g]overnment-created reverse sting operations are recognized and useful methods of law enforcement investigation." Ciszkowski, 492 F.3d at 1271.

As early as his second meeting with Sardinas, Gonzalez, and Agent Checo, Wong said, "I have the group already." He clearly did not require much, if any, encouragement. When meeting with Gonzalez and Checo the day before the

robbery, Wong was asked if he had everything he needed to commit the robbery, including firearms, and he responded affirmatively.

Wong has never disputed that he, and not the government, obtained the additional people to participate in the robbery. Nor has he ever accused the government of providing the firearm that resulted in his thirty-year mandatory minimum consecutive sentence. All he accuses the government of is constructing a fictional scenario involving some danger and encouraging him to obtain additional conspirators and a firearm for use in the robbery. We have rejected a sentencing factor manipulation argument where the government selected an age for a fictional victim in a sting operation, resulting in a guideline enhancement. United States v. Bohannon, 476 F.3d 1246, 1252 (11th Cir. 2007). We have also rejected a claim of sentencing factor manipulation where the government provided the defendant with a firearm that was, unbeknownst to the defendant, equipped with a silencer for use in a murder for hire. Ciszkowski, 492 F.3d at 1266, 1271. In light of Bohannon, Ciszkowski, and similar cases, Wong has fallen far short of demonstrating the type of "sufficiently reprehensible," "extraordinary" misconduct that we have from time to time suggested might support a finding of sentencing factor manipulation. Id. at 1271.

## VII.

Wong was convicted on Count 3 for conspiracy to possess with intent to distribute five or more kilograms of cocaine, in violation of 21 U.S.C. §§ 846 and 841(a)(1) & (b)(1)(A)(ii), and on Count 4 for attempted possession with intent to distribute five or more kilograms of cocaine, in violation of 21 U.S.C. §§ 846, 841(a)(1) & (b)(1)(A)(ii), and 18 U.S.C. § 2.  Because those convictions involved more than five kilograms of cocaine and because the government filed an information notifying Wong of a prior felony narcotics conviction, they resulted in the imposition of concurrent statutory mandatory minimum sentences of twenty years imprisonment.  See 21 U.S.C. § 841(b)(1)(A) ("If any person commits such a violation after a prior conviction for a felony drug offense has become final, such person shall be sentenced to a term of imprisonment which may not be less than 20 years . . . ."); id. § 851(a).  Wong argues that those twenty-year sentences are constitutionally disproportionate.

We review de novo Wong's constitutional challenge to his sentence.  United States v. Lyons, 403 F.3d 1248, 1250 (11th Cir. 2005).  The Supreme Court has "recognized 'that the Cruel and Unusual Punishments Clause encompasses a narrow proportionality principle' that applies to non-capital sentences."  United States v. Farley, ___ F.3d ___, No. 08-15882, 2010 WL 2179617, at *40 (11th Cir.

43

June 2, 2010) (quoting Harmelin v. Michigan, 501 U.S. 957, 997, 111 S.Ct. 2680, 2702–03 (1991) (plurality opinion)). When addressing an Eighth Amendment proportionality challenge:

> a court must make a threshold determination that the sentence imposed is grossly disproportionate to the offense committed. The defendant has the burden of making that showing. If the sentence is grossly disproportionate, the court must then consider the sentences imposed on others convicted in the same jurisdiction and the sentences imposed for commission of the same crime in other jurisdictions.

United States v. Johnson, 451 F.3d 1239, 1243 (11th Cir. 2006) (citations and quotation marks omitted).

In evaluating the proportionality of Wong's sentence, we look to Harmelin v. Michigan, 501 U.S. 957, 111 S.Ct. 2680 (1991), which is right on point. In Harmelin the defendant was sentenced to life imprisonment without parole, "the second most severe penalty permitted by law," for possessing 672 grams of cocaine. Id. at 1001, 111 S.Ct. at 2705 (plurality opinion). Wong's offenses were more serious than the one committed by Harmelin: Wong was convicted of conspiring and attempting to possess with intent to distribute five or more kilograms of cocaine (5,000 grams), more than seven times as much cocaine as Harmelin was convicted of possessing (672 grams). The amount of drugs in the Harmelin case "threatened to cause grave harm to society." Id. at 1002, 111 S.Ct. at

44

2706 (plurality opinion).  There were more drugs involved and thus a greater threat of harm to society here.[2]  And Harmelin had no prior felony convictions, while Wong had several prior convictions, at least two of which involved controlled substances.

Not only was Wong convicted of crimes more serious than the one in Harmelin, but he received a less severe sentence than Harmelin did.  "[I]t necessarily follows that a sentence [of twenty years] is not grossly disproportionate to [Wong's] crime."  See Farley, ___F.3d___, 2010 WL 2179617, at *44.  "As a result, comparison of the [twenty-year] sentence to the sentences authorized or required under other statutes in this or another jurisdiction is not appropriate."  Id.  The concurrent twenty-year sentences imposed on Wong for his convictions on Counts 3 and 4 do not violate the Eighth Amendment.

## VIII.

De Armas' conviction is REVERSED.  The convictions of Socorro and Wong are AFFIRMED.  The sentences of Wong and Sardinas are also AFFIRMED.

---

[2]The fact that Wong was caught in a sting operation makes no difference.  See Farley, ___ F.3d ___, 2010 WL 2179617, at *44 (explaining that "[i]n judging the seriousness of the crime," we "look[] at the harm caused by the type of crime at issue in [the] case," not the harm the defendant actually succeeded in inflicting).