[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
OCTOBER 21, 2011
JOHN LEY
CLERK

No. 10-11825

_____

D.C. Docket No. 2:09-cr-00013-JES-SPC-1

UNITED STATES OF AMERICA,

Plaintiff - Appellee,

versus

PATRICIA GRAY,

Defendant - Appellant.

_____

Appeal from the United States District Court
for the Middle District of Florida

_____

(October 21, 2011)

Before MARCUS, WILSON  and COX, Circuit Judges.

PER CURIAM:

Patricia Gray was convicted by a jury for one count of fraud affecting a

financial institution, 18 U.S.C. § 1344, two counts of wire fraud, 18 U.S.C. § 1343, and two counts of money laundering, 18 U.S.C. § 1957. She now appeals the district court's denial of her motion for acquittal on all charges. She also argues for an acquittal or mistrial on the basis of erroneous admittance of trial evidence, prosecutorial misconduct, and overall cumulative error by the trial court. Additionally, Gray asserts that the district court violated her due process rights by denying her request to have a jury decide the government's forfeiture motion for a money judgment against her. We deny Gray's appeal and affirm the district court.

## I. BACKGROUND[1]

Patricia Gray, a landlord owning a number of properties, approached her tenant Michelle McKay in the summer of 2007 to inquire whether McKay would be interested in buying Gray's home that McKay had been renting at 237 Eugenia Avenue (the "Eugenia Property"). McKay expressed interest in the offer and later met with Machell Proctor, a loan originator at Gulf to Bay Mortgage Company, to discuss the transaction. During their meeting, McKay told Proctor that she did not have enough money to make a down payment on the house. Proctor informed

---

[1] We present the facts in the light most favorable to the jury verdict. *See United States v. Hamaker*, 455 F.3d 1316, 1332 n.17 (11th Cir. 2006).

Gray of this problem.

Proctor then proceeded to make arrangements for McKay to obtain a "gift letter" to submit to the bank to make up for her lack of funds. Proctor had McKay's brother, Roy Denson, compose a letter stating that Denson intended to give McKay a $37,000 gift for the purchase of her home that McKay would not be expected to pay back. Because Denson did not actually have $37,000, Proctor also arranged for an outside investor, Albert Slattman, to purchase a $37,000 cashier's check in Denson's name. McKay, under the instructions of Proctor, then signed a bank loan application stating that McKay would contribute $30,587 toward the $117,000 purchase price of the Eugenia Property. This application and the "gift letter" were submitted together to IndyMac Bank, a federally insured bank.

IndyMac was unable to approve the loan immediately, though, and Slattman requested a return of his money. Proctor, needing a new third-party to assist with the transaction funding, then contacted Individual Freedom Ministries Church ("IFMC"), a non-profit organization with a down payment assistance program. This program involved IFMC making a "gift" to the property buyer before closing, and the seller making a "contribution" to IFMC after closing that equaled the amount of the original "gift" plus a 10% service charge. Gray agreed in a signed writing (the "IFMC agreement") that if IFMC gave McKay enough

3

money to make a down payment, Gray would pay IFMC $29,212.00 of the proceeds of the sale of the Eugenia Property.

Early in November 2007, IndyMac sent Proctor a conditional approval notice for a $93,000 loan. One such condition was that Gray could not credit McKay with more than 6% of the purchase price. Closing occurred on November 14, 2007, and IndyMac Bank was forwarded the relevant United States Department of Housing and Urban Development Settlement Statement ("the HUD statement") that Manasota Title had prepared at the request of the selling party. The HUD statement explained the breakdown for the disbursement of funds related to the transaction; it showed that Gray was contributing only 6% of the purchase price. The HUD statement also said that Gray had to pay off a "personal loan" to IFMC out of the sale proceeds. Proctor had told Debbie Love, the closing agent from Manasota Title, that Gray was repaying a personal loan to her church, and Love had confirmed this with Gray. Gray and McKay both reviewed the HUD statement with Love at closing, verified its accuracy, and signed it.

In conjunction with the closing, Manasota Title received two wire transfers: one transfer of $94,580.74 from IndyMac's account in California to Manasota's Florida office, and one transfer in the amount of $25,613.62, ostensibly from Gray, but actually from IFMC. The day after closing, Manasota wired IFMC $29,212.00

4

of the proceeds, as Gray had instructed. Gray was wired the remaining $77,070.89 of the proceeds, and she immediately wrote a $25,000 check to each of her two daughters; both daughters then deposited the checks in their personal accounts.

On December 17, 2007, law enforcement agents investigated Gray's home, pursuant to a search warrant relating to potential criminal activities of her grandson, and they discovered the IFMC agreement. Because IFMC was under police scrutiny for its potentially illegal down payment program, an investigation of the sale of the Eugenia Property was initiated. In August 2009, Gray was charged with (1) one count of bank fraud, in violation of 18 U.S.C. § 1344; (2) two counts of wire fraud affecting a financial institution, in violation of 18 U.S.C. § 1343; and (3) two counts of money laundering, in violation of 18 U.S.C. § 1957. Proctor was also charged with and pled guilty to financial fraud and wire fraud charges. Gray was tried by jury on October 13, 2009 and convicted on all counts.

## II. MOTION FOR ACQUITTAL

This Court reviews *de novo* a denial of a motion for acquittal and the sufficiency of evidence to support the conviction. *United States v. Evans*, 473 F.3d 1115, 1118 (11th Cir. 2006). When making our *de novo* review of the sufficiency of the evidence, we examine all evidence in a light most favorable to the prosecution; all reasonable inferences and credibility determinations are drawn

in the government's favor. *United States v. Hamaker*, 455 F.3d 1316, 1332 n.17 (11th Cir. 2006). We ask whether any reasonable fact finder could conclude that the evidence demonstrates the guilt of the defendant beyond a reasonable doubt. *United States v. Eckhardt*, 466 F.3d 938, 944 (11th Cir. 2006).

*A. Bank Fraud*

To establish a bank fraud violation pursuant to 18 U.S.C. § 1344(1), the government must prove beyond a reasonable doubt "(1) that the defendant intentionally participated in a scheme or artifice to defraud another of money or property; and (2) that the intended victim of the scheme or artifice was a federally-insured financial institution." *United States v. McCarrick*, 294 F.3d 1286, 1290 (11th Cir. 2002) (citation omitted). Under 18 U.S.C. § 1344(2), the government must show "(1) a scheme existed to obtain money, funds, or credit in the custody of a federally insured financial institution; (2) the defendant participated in the scheme by means of false pretenses, representations, or promises, which were material; and (3) the defendant acted knowingly." *United States v. Williams*, 390 F.3d 1319, 1324 (11th Cir. 2004) (citation omitted).

There is sufficient trial evidence to support Gray's bank fraud conviction. Gray was aware that McKay did not have sufficient funds to purchase Gray's home. When Proctor explained to Gray that a third-party was available to loan the

6

down payment money to McKay, Gray agreed to repay the third-party. This arrangement effectively reduced the sale price that McKay would pay, but the use of the third-party loan, rather than an outright reduction in the property's price, created the illusion of a higher property value. Because IndyMac calculates its loans as a percentage of the property price, McKay was able to obtain a loan that would otherwise not have been available.

In the course of this scheme, Gray made false representations on the HUD statement, mischaracterizing the nature of the her payment to IFMC as a personal loan, rather than a loan relating to the down payment on the Eugenia Property. IndyMac, relying on these statements, was deceived into making a loan that it would have not have made had it known the truth. The fact that Gray did not participate in or know all the elements of the scheme does not negate her guilt because a "culpable aider and abetter need not perform the substantive offense, need not fully know of its details, and need not even be present." *United States v. Hernando Ospina*, 798 F.2d 1570, 1581 (11th Cir. 1986) (per curiam) (quotation omitted). A reasonable fact finder could conclude that this evidence proves beyond a reasonable doubt that Gray participated in a bank fraud scheme.

*B. Wire Fraud*

To establish wire fraud under 18 U.S.C. § 1343, the government must prove

that Gray (1) intentionally participated in a scheme to defraud and (2) used the interstate wires in furtherance of the scheme. *United States v. Robertson*, 493 F.3d 1322, 1331 (11th Cir. 2007). "The use of the wires need not be actually intended; it need only be reasonably foreseeable." *United States v. Hasson*, 333 F.3d 1264, 1270 (11th Cir. 2003) (citing *United States v. Ross*, 131 F.3d 970, 985 (11th Cir. 1997)).

As we discussed above, there was sufficient evidence that Gray intentionally participated in a scheme to defraud. This scheme caused two wire transfers to occur. First, IndyMac Bank transferred funds from its account in California to a Manasota Title account in Florida. Second, Manasota Title transferred the proceeds from the sale of the Eugenia Property to Gray's Suncoast Schools Federal Credit Union account. Although Gray did not wire the funds herself, the evidence is sufficient to show that the use of the wires would have been reasonably foreseeable, especially as Gray used the wires to receive payment to her personal account.

*C. Money Laundering*

A money laundering conviction under 18 U.S.C. § 1957 requires a showing that Gray "knowingly engaged or attempted to engage in a monetary transaction in criminally derived property that is of value greater than $10,000 and is derived

from specified unlawful activity." *United States v. Johnson*, 440 F.3d 1286, 1289 (11th Cir. 2006) (per curiam) (citation omitted). The term monetary transaction means "the deposit, withdrawal, transfer, or exchange, in or affecting interstate or foreign commerce, of funds . . . by, through, or to a financial institution." 18 U.S.C. § 1957(f)(1). Criminally derived property is defined as "any property constituting, or derived from, proceeds obtained from a criminal offense." *Id.* § 1957(f)(2). Specified unlawful activity means "any act or activity constituting an offense under 18 U.S.C. § 1961(1)." *Johnson*, 440 F.3d at 1289 (citing 18 U.S.C. § 1956(c)(7)(A)). Section 1961 includes offenses under 18 U.S.C. §§ 1343 and 1344. *See* 18 U.S.C. § 1961(1). The government need not prove that the defendant knew that the offense from which the criminally derived property arose was specified unlawful activity. *See id.* § 1957(c).

There was sufficient evidence for a fact finder to conclude that Gray participated in a scheme to defraud that resulted in the sale of Gray's home, which would render the proceeds of the sale criminally derived property. The offenses alleged against Gray, bank fraud and wire fraud, are both types of specified unlawful activity. *See* 18 U.S.C. § 1961(1). When Gray received the money resulting from the fraud, Gray transferred $25,000 to each of her two daughters. This evidence sufficiently establishes Gray's guilt on the charges of money

9

laundering under § 1957.[2]

### III. OBJECTIONS TO TRIAL PROCEEDINGS

Gray alleges that errors during the trial proceedings—incorrect evidentiary rulings by the district court, prejudicial conduct by the prosecutors, and overall cumulative error—warrant a reversal of her convictions.  We disagree.

*A.  Evidentiary Rulings*

Gray argues that the trial court improperly admitted irrelevant and prejudicial evidence, allowed hearsay evidence, and permitted leading questions. We review evidentiary rulings of a district court for clear abuse of discretion. *United States v. Perez-Oliveros*, 479 F.3d 779, 783 (11th Cir. 2007).  We will reverse an erroneous evidentiary ruling "only if the resulting error was not harmless."  *United States v. Dickerson*, 248 F.3d 1036, 1048 (11th Cir. 2001) (internal quotation marks omitted).  An error is harmless unless "there is a reasonable likelihood that [it] affected the defendant's substantial rights."  *United States v. Hawkins*, 905 F.2d 1489, 1493 (11th Cir. 1990).  If the district court's evidentiary error "had no substantial influence on the outcome" of the trial, and "sufficient evidence uninfected by error supports the verdict," the error will not

---

[2] Gray argues that the government has not demonstrated that Gray took any steps to conceal funds.  Concealment is an element of 18 U.S.C. § 1956, a different money laundering statute, but is not required by 18 U.S.C. § 1957, under which Gray was charged.

warrant a reversal. *United States v. Fortenberry*, 971 F.2d 717, 722 (11th Cir. 1992). We determine whether an error had substantial influence on the outcome by weighing the record as a whole, *see United States v. Montalvo-Murillo*, 495 U.S. 711, 722, 110 S. Ct. 2072, 2080 (1990), and examining "the facts, the trial context of the error, and the prejudice created thereby as juxtaposed against the strength of the evidence of defendant's guilt," *United States v. Reed*, 700 F.2d 638, 646 (11th Cir. 1983) (internal quotation marks omitted). Gray bears the burden of demonstrating that the court made errors that affected her substantial rights. *See United States v. Cameron*, 907 F.2d 1051, 1059 (11th Cir. 1990).

Relevant evidence is "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Fed. R. Evid. 401. A court may exclude relevant evidence if "its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury." Fed. R. Evid. 403.

First, Gray argues that Agent Leverenz's testimony—that he had discovered the IFMC agreement documentation in Gray's house pursuant to a search warrant-authorized inspection—was irrelevant, and the use of the term "search warrant" was prejudicial. Second, Gray asserts that it was irrelevant

testimony when Love, the Manasota Title Company employee, expressed that had she known that IFMC, not McKay, had actually made the down payment for the Eugenia Property, she would have revealed that information to IndyMac. Third, Gray posits that McKay's testimony—about why McKay believed that gift money was necessary if Gray was going to make the down payment—was speculative and irrelevant. Finally, Gray objects to the testimony of Winfield Scott Husted, a prior IndyMac employee who had worked on the Eugenia Property financing. Gray argues that his testimony—that he would have been surprised to find out that Gray made the down payment for McKay's loan—was irrelevant. We find that the evidence to which Gray objects was sufficiently relevant to demonstrate the discovery, existence, and nature of the fraudulent scheme, such that the district court did not abuse its discretion in admitting the evidence.

Gray also alleges that the IFMC agreement was inadmissible hearsay that was improperly admitted. However, under Rule 801(d)(2)(A) of the Federal Rules of Evidence, "[a] statement is not hearsay if . . . [t]he statement is offered against a party and is . . . the party's own statement, in either an individual or a representative capacity." The government laid a sufficient foundation to indicate that the IFMC agreement represented an arrangement between Gray and IFMC, such that the IFMC agreement would constitute a party admission by Gray under

the Federal Rules of Evidence. We thus find no abuse of discretion in the district court's admission of the agreement as non-hearsay.

Finally, Gray asserts that the government impermissibly used leading questions on three instances: two questions were asked during cross-examination, and thus appropriate, *see* Fed. R. Evid. 611(c), and the other was not objected to at trial. Gray fails to state any specifics that would demonstrate that the district court committed an abuse of discretion in permitting the questions.

### B. *Prosecutorial Misconduct*

We review allegations of prosecutorial misconduct *de novo* because they involve mixed questions of law and fact. *United States v. Merrill*, 513 F.3d 1293, 1306 (11th Cir. 2008). To establish prosecutorial misconduct relating to remarks during trial, "(1) the remarks must be improper, and (2) the remarks must prejudicially affect the substantial rights of the defendant." *Id.* at 1307 (internal quotation marks omitted). A defendant's substantial rights are prejudicially affected when there is a reasonable probability that, "but for the remarks, the outcome of the trial would have been different." *Id.* (internal quotation marks omitted). In our assessment of the potential prejudicial effects of the prosecutor's comments, we evaluate them in the context of the trial as a whole and assess their probable impact on the jury. *United States v. Hernandez*, 145 F.3d 1433, 1439

(11th Cir. 1998). We consider the presence of curative instructions and the strength of the government's case. *United States v. Smith*, 918 F.2d 1551, 1562 (11th Cir. 1990) ("Because statements and arguments of counsel are not evidence, improper statements can be rectified by the district court's instruction to the jury that only the evidence in the case be considered."); *Rodriguez*, 765 F.2d at 1560.

During opening statements, prosecutors should avoid referring to evidence that is of questionable admissibility. *United States v. Adams*, 74 F.3d 1093, 1097 (11th Cir. 1996). The government explained in its opening that it had investigated Gray's grandson, had sought criminal forfeiture of two of Gray's properties in relation to that investigation, and had been contemplating forfeiture of more of Gray's properties, including the Eugenia Property. Gray contends that these remarks were improper and prejudicial. However, later trial testimony expounding upon these comments helped to establish a potential motive for Gray's possible fraudulent activities: a desire to quickly dispose of the Eugenia Property. Furthermore, the judge clearly instructed the jury before and after the opening that the opening remarks were not to be considered as evidence. When the comments are viewed in context of the trial, we find that none of Gray's rights were substantially prejudiced.

During closing argument, a prosecutor may "assist the jury in analyzing,

evaluating, and applying the evidence" and may urge the jury to draw inferences and conclusions from the evidence presented at trial. *United States v. Johns*, 734 F.2d 657, 663 (11th Cir. 1984) (citation omitted). Although the prosecutor may not make improper suggestions, insinuations, or assertions calculated to mislead or inflame the jury's passions, *United States v. Rodriguez*, 765 F.2d 1546, 1560 (11th Cir. 1985), he may make colorful and flamboyant remarks relating to trial evidence, *see United States v. Jacoby*, 955 F.2d 1527, 1541 (11th Cir. 1992).

Gray objected at trial to the prosecutor's closing argument request that the jury consider whether the loan arrangement at issue "feels shifty," and she now raises that challenge again, claiming that the remark constituted a misstatement of law and an introduction of new evidence. We disagree. Such a comment falls within the prosecutor's right to ask the jurors to evaluate evidence, and though "shifty" may be a colorful term, we find no intent to mislead the jury into believing that "shifty" reflects a standard of law.

Gray also asserts that prosecutorial misconduct occurred when the prosecutor incorrectly stated the testimony of Albert Borg, owner of Gulf to Bay Mortgage Company. In his closing, the prosecutor claimed that Borg had testified that it was "unusual, or unheard of" for a seller to pay 20% of the down payment for a property, but Borg had actually said that this occurrence was "normal."

15

Because Gray made no objection to the prosecutor's statement at the time of trial, we review the statement for plain error "that is so obvious that failure to correct it would jeopardize the fairness and integrity of the trial." *United States v. Bailey*, 123 F.3d 1381, 1400 (11th Cir. 1997). Here, the court instructed the jury that closing arguments are not evidence, and that if an attorney's representations of the evidence differed from the jurors' recollections of the actual evidence, they must follow their own recollections. Given that this instruction was made and there is no other evidence of intentional misconduct by the prosecutor, we do not find error that would jeopardize the fairness and integrity of the trial.

### C. Cumulative Error

The doctrine of cumulative error is that an aggregation of non-reversible errors, such as harmless errors, can add up to an overall "denial of the constitutional right to a fair trial, which calls for reversal." *United States v. Baker*, 432 F.3d 1189, 1223 (11th Cir. 2005) (quotation omitted). The finding of such cumulative error requires that more than one error occur. *United States v. Waldon*, 363 F.3d 1103, 1110 (11th Cir. 2004) (per curiam). In determining whether there was cumulative error, we "examine the trial as a whole to determine whether the appellant was afforded a fundamentally fair trial." *United States v. Calderon*, 127 F.3d 1314, 1333 (11th Cir. 1997). We evaluate whether individual errors affected

16

Gray's substantial rights, but keep in mind that cumulative prejudicial effect may exceed the sum of prejudice caused by each individual error. *Baker*, 432 F.3d at 1223. Because we have found few, if any, errors, and the record reflects substantial evidence to establish Gray's guilt on all counts, we find no indication that Gray was deprived of a fair trial as a result of cumulative error.

## IV. FORFEITURE MOTION

Gray argues that the district court incorrectly denied Gray's request that a jury decide the government's forfeiture motion for a personal money judgment against her. We review *de novo* a district court's conclusions of law, *United States v. Kennedy*, 201 F.3d 1324, 1329 (11th Cir. 2000), such as a forfeiture motion. Federal Rule of Criminal Procedure 32.2(b)(1)(A) states, "[i]f the government seeks a *personal money judgment*, the *court* must determine the amount of money that the defendant will be ordered to pay." (emphasis added). If the government seeks forfeiture of a *specific property*, the *court* must determine "what property is subject to forfeiture under the applicable statute," *and* "whether the government has established the requisite nexus between the property and the offense." Fed. R. Crim. P 32.2(b)(1)(A) (emphasis added). However, a party may request that a *jury* "determine the forfeitability of *specific property*," Fed. R. Crim. P. 32.3(b)(5) (emphasis added). Gray argues that Federal Rule of Criminal Procedure

17

32.3(b)(5) should be read to apply to personal money judgments, as well, but we find no grounding in the language of the statute to support this contention. Nor are we convinced by Gray's argument that her constitutional due process rights are impinged. Since forfeiture is an aspect of the sentencing procedure, "the right to a jury verdict on forfeitability does not fall within the Sixth Amendment's constitutional protection." *United States v. Libretti*, 516 U.S. 29, 49, 116 S. Ct. 356, 367–68 (1995). Given that we find no statutory or constitutional support for Gray's objection, we affirm the district court's resolution of Gray's monetary forfeiture challenge.

**AFFIRMED.**