[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 10-14665

_____

D.C. Docket No. 2:09-cr-00077-JES-SPC-3

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

IVAN CURBELO,

Defendant-Appellant.

_____

Appeals from the United States District Court
for the Middle District of Florida

_____

(August 9, 2013)

Before DUBINA, JORDAN and BALDOCK,[*] Circuit Judges.

BALDOCK, Circuit Judge:

_____

[*] Honorable Bobby R. Baldock, United States Circuit Judge for the Tenth Circuit, sitting
by designation.

A jury convicted Defendant Ivan Curbelo of conspiracy to manufacture and possess marijuana with intent to distribute, as well as the substantive crime of manufacturing and possessing marijuana with intent to distribute.  He now appeals, challenging his conviction and sentence.  We have jurisdiction under 28 U.S.C. § 1291 and 18 U.S.C. § 3742.  We affirm.

## I.

Defendant began working for Jose Diaz as a carpenter around 2007, doing finish work inside Diaz's residence in Naples, Florida.  But Diaz, who had been running an indoor marijuana growing operation since 2002, soon offered Defendant the opportunity to engage in that more lucrative business.  Apparently, it was an offer Defendant could not refuse.  In 2007, Diaz purchased a home on Abdella Lane in North Port, Florida, putting the house in Defendant's name. Defendant and his cousin Carlos Curbelo prepared the house to grow marijuana, and Defendant then hired Carlos as caretaker.  Diaz paid Defendant 30 percent of the profits to supervise the house, and Defendant in turn paid Carlos 15 percent to serve as caretaker.  Defendant eventually replaced Carlos with Damien Alzarez. Sometime in 2008, Diaz put Defendant in charge of another grow house on Van Camp Street because he was dissatisfied with that house's yield.  Defendant hired a woman to act as caretaker.  When the house developed an electrical problem

after only one harvest, Defendant oversaw the installation of a transformer that Diaz had stolen. Diaz testified that Defendant participated in a total of six marijuana harvests between the Abdella and Van Camp houses. Diaz said each harvest at the Abdella house yielded 190 plants, except for the last harvest, which yielded between 240 and 250 plants because of the addition of the garage. He said each harvest at Van Camp produced 190 plants. Diaz also testified that Defendant helped process some plants cut at a grow house on Everglades Boulevard and provided the new seedlings for that house.

In the course of investigating Diaz's organization, Drug Enforcement Administration (DEA) agents placed global–positioning–system (GPS) tracking devices on vehicles used by Diaz and another of his right-hand men, Herman Torres. The investigators did not obtain a warrant before installing the tracking devices. The DEA also conducted GPS tracking of cellular phones used by unspecified members of the organization. Investigators obtained court authorization to intercept Diaz's cellular phone communications. They intercepted Diaz's conversations with Defendant and Herman Torres, in which they discussed many aspects of the marijuana growing operation.

A grand jury indicted Defendant and the other members of the Diaz conspiracy with violations of the Controlled Substances Act. The superseding

3

indictment charged Defendant with (1) conspiring to manufacture and possess with intent to distribute 1,000 or more marijuana plants and to distribute and possess with intent to distribute 100 or more kilograms of marijuana in violation of 21 U.S.C. §§ 841(a)(1), (b)(1)(A)(vii), (b)(1)(B)(vii), and 846, and (2) manufacturing and possessing with intent to distribute 100 or more marijuana plants in violation of 21 U.S.C. § 841(a)(1) and (b)(1)(B)(vii) and 18 U.S.C. § 2. Defendant went to trial along with four of his co-conspirators.

During trial, the Government played recordings of the wiretaps of Diaz's telephone. Most of the conversations were in Spanish, so the Government provided the jury an English-language transcript. The Government did not identify who prepared the transcript. Instead, the Government established the accuracy of the transcripts through the testimony of Diaz, who was able to speak and read both Spanish and English. Defendant's trial counsel objected to the translations as hearsay and as "a violation of [the] confrontation clause." Doc. 450 at 130.[1] He continued, "The person, who translated the records, . . . that person's not here. I can't cross examine." Id. The district court overruled these objections

---

[1] Defendant appealed along with three of his co-defendants, with each defendant filing a separate record on appeal in their corresponding case numbers. Only one of the co-defendants, however, included the trial transcripts from their joint trial. This creates some confusion in the page numbering. Accordingly, when we cite the trial transcripts in this case, we will cite the district court docket. See Fed. R. App. P. 10(a)(2). When we cite the "Record," we mean the four-volume record filed in this case, appellate number 10-14665.

and allowed the jury to view the translated transcripts. The jury convicted Defendant on both counts. Defendant's initial guideline imprisonment range under the United States Sentencing Guidelines was 108–135 months, but his conviction on the conspiracy count carried a mandatory minimum sentence of ten years. See 21 U.S.C. § 841 (b)(1)(A)(vii). Accordingly, the district court sentenced Defendant to concurrent 120-month sentences on each count. The court also imposed a joint and several forfeiture judgment against Defendant and his co-defendants in the amount of $850,000.

Defendant appeals, raising the following five arguments: (1) the GPS tracking evidence was obtained in violation of the Fourth Amendment, (2) trial counsel was ineffective for failing to move to suppress the GPS tracking evidence, (3) the evidence was insufficient to support a sentencing enhancement for conspiracy to possess over 1,000 plants, (4) the court violated the Confrontation Clause by admitting the translated transcripts, and (5) the court erred in not submitting the forfeiture allegations to the jury.

## II.

We turn first to Defendant's Fourth Amendment argument. He argues the district court plainly erred when it allowed the Government to present evidence obtained from the GPS tracking of Diaz and Herman Torres's vehicles and some

5

of the conspirators' cellular phones.  Defendant relies on the Supreme Court's

holding, handed down more than a year after his trial, that "the attachment of a

Global–Positioning–System (GPS) tracking device to an individual's vehicle, and

subsequent use of that device to monitor the vehicle's movements on public

streets, constitutes a search or seizure within the meaning of the Fourth

Amendment."  United States v. Jones, 132 S. Ct. 945, 948 (2012).  Defendant did

not file a motion to suppress the GPS-tracking evidence in the district court, but he

claims we can review the issue for plain error.[2]  See Fed. R. Crim. P. 52(b).  The

Government, in turn, argues Defendant waived the issue entirely.

Federal Rule of Criminal Procedure 12(b)(3) requires motions to suppress to

be made before trial.  Rule 12(e), in turn, says, "A party waives any Rule 12(b)(3)

defense, objection, or request not raised by the deadline the court sets under Rule

12(c) or by any extension the court provides.  For good cause, the court may grant

relief from the waiver."  In keeping with Rule 12(e), we have said, "A defendant

who fails to make a timely suppression motion cannot raise that claim for the first

---

[2] As the Government points out, it is not entirely clear any evidence introduced at trial resulted from the GPS tracking.  But the affidavit supporting the search warrant for the Van Camp house said, "The data received from these GPS tracking devices led to the identification of a suspected grow house located at 6800 Van Camp Street in North Port, Florida."  Record, vol. 2 at 222.  Most of the warrant applications for the other grow houses contained similar language.  So an evidentiary hearing might well have shown the physical evidence at those houses was fruit of the GPS tracking.

6

time on appeal." United States v. Lall, 607 F.3d 1277, 1288 (11th Cir. 2010) (brackets omitted) (quoting United States v. Pope, 467 F.3d 912, 918 (5th Cir. 2006)).

Defendant tries to get around Rule 12(e)'s waiver rule by invoking Griffith v. Kentucky, 479 U.S. 314 (1987).  In Griffith, the Supreme Court held that "a new rule for the conduct of criminal prosecutions is to be applied retroactively to all cases, state or federal, pending on direct review or not yet final, with no exception for cases in which the new rule constitutes a 'clear break' with the past." Id. at 328.  But Griffith does not save Defendant's suppression argument.  "The Griffith holding . . . applies only to defendants who preserved their objections throughout the trial and appeals process." United States v. Verbitskaya, 406 F.3d 1324, 1340 n.18 (11th Cir. 2005).  See also Shea v. Louisiana, 470 U.S. 51, 59 n.4 (1985) (observing that retroactive application of the Fifth and Fourteenth Amendments is subject "to established principles of waiver, harmless error, and the like").  So, even though Defendant's case was pending on appeal when the Supreme Court decided Jones, Defendant cannot take advantage of Jones's holding.  As the Tenth Circuit recently explained,

> To say that Jones should be the governing law on this direct appeal is
> to say no more than that it should be treated the same as law that had
> been settled years earlier.  And arguments based on years-ago

7

> decisions certainly can be forfeited and waived (otherwise nothing could be waived under Rule 12(e)), even though there could be no dispute that those decisions "apply" to cases on appeal.

United States v. Baker, 713 F.3d 558, 562 (10th Cir. 2013). In short, Griffith does not allow Defendant to get around our usual rule that failing to file a suppression motion waives Fourth Amendment claims, even claims based on a new ruling from the Supreme Court.

Because Defendant waived this argument under Rule 12(e), we need only examine whether good cause would support relief from the waiver. Defendant has not pointed to anything that would qualify as good cause. No good cause exists if "the defendant had all the information necessary to bring a Rule 12(b) motion before the date set for pretrial motions, but failed to file it by that date." United States v. Seher, 562 F.3d 1344, 1359 n.15 (11th Cir. 2009). Here, Defendant was aware before trial that the Government used GPS tracking, but he did not challenge the tracking. So we will not set aside Defendant's waiver of his suppression claim.[3]

---

[3] The Government also argues Defendant has no Fourth Amendment standing because the record does not indicate the DEA tracked Defendant's vehicle or cellular phone. See United States v. Gibson, 708 F.3d 1256, 1277 (11th Cir. 2013). We need not reach this issue because Defendant waived the Fourth Amendment argument. Of course, the doctrine of standing as it relates to our jurisdiction under Article III is ordinarily a question we resolve before turning to anything else. Nat'l Parks Conservation Ass'n v. Norton, 324 F.3d 1229, 1242 (11th Cir. 2003). But a person's ability to raise a Fourth Amendment challenge is not a matter of Article III standing, but of "substantive Fourth Amendment law." Rakas v. Illinois, 439 U.S. 128, 140

8

III.

Defendant next argues his trial counsel was ineffective because he failed to move to suppress the GPS evidence. "Except in the rare instance when the record is sufficiently developed, we will not address claims for ineffective assistance of counsel on direct appeal." Verbitskaya, 406 F.3d at 1337. An ineffective assistance claim should usually be raised in a motion under 28 U.S.C. § 2255. United States v. Patterson, 595 F.3d 1324, 1328 (11th Cir. 2010). Defendant asserts that the record is sufficiently developed to conclude his counsel was ineffective. But the record does not show the DEA ever tracked Defendant's telephone or vehicle. Thus, on this record, Defendant's counsel had no basis for filing a suppression motion. See United States v. Gibson, 708 F.3d 1256, 1277 (11th Cir. 2013) (holding that a defendant could not challenge the GPS tracking of a vehicle "when it was moving on public roads and he was neither the driver nor a passenger"). And it goes without saying that counsel is not ineffective for failing to file a meritless suppression motion. See Jefferson v. Fountain, 382 F.3d 1286, 1297 (11th Cir. 2004). We simply cannot consider Defendant's ineffective assistance claim on this record.

IV.

---

(1978). So we can decide this case based on Defendant's waiver alone.

9

Next, Defendant argues the evidence was insufficient to support the sentencing enhancement for a conspiracy involving more than 1,000 marijuana plants. The Government argues that we review "for clear error the district court's determination of the drug quantity attributable to a defendant." Appellant's Br. at 32. This properly states our standard or review for a district court's factual findings at sentencing. See United States v. Carillo-Ayala, 713 F.3d 82, 87 (11th Cir. 2013). But the drug quantities in this case were found by a jury, not the court. We review a jury's findings *de novo*, asking "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979) (emphasis omitted). Until recently, the Government might have been right about the standard of review. That is, we might have concluded that since the jury did not *need* to find the drug quantity, we could simply review the district court's application of the jury's findings as if they were the court's own. But that door was closed by the Supreme Court's recent decision in Alleyne v. United States, 133 S. Ct. 2151 (2013), as we explain.

Section 846 of Title 21 says, "Any person who attempts or conspires to commit any offense defined in this subchapter shall be subject to the same penalties as those prescribed for the offense, the commission of which was the

object of the attempt or conspiracy." The indictment in this case charged Defendant with conspiracy to violate § 841(a)(1) and with the penalties in subsections (b)(1)(A)(vii) (for 1,000 or more marijuana plants) and (b)(1)(B)(vii) (for 100 kilograms or more of marijuana). Section 841(a)(1) generally proscribes knowingly or intentionally manufacturing or possessing with intent to distribute a controlled substance. The maximum sentence for possessing a Schedule I substance (including marijuana) in violation of § 841(a)(1) is 20 years. A simple violation of § 841(a) carries no mandatory minimum. Subsections (b)(1)(A) and (b)(1)(B), however, increase the statutory maximum and impose mandatory minimums. They increase the maximum sentence to either life imprisonment (for 1,000 or more marijuana plants) or 40 years (for 100 kilograms or more of marijuana). They also carry mandatory minimum sentences of ten and five years, respectively.

The statutory scheme is straightforward enough. The more complicated question has been who is responsible for making factual findings—the court or the jury. Prior to 2000, this circuit said a jury only needed to find the elements of the § 841(a)(1) offense and that the district court could impose sentence enhancements under § 841(b) based on its own factual findings. See United States v. Hester, 199 F.3d 1287, 1292–93 (11th Cir. 2000) (rejecting the argument that the enhancement

11

under § 841(b)(1)(A)(vii) for 1,000 or more marijuana plants was an element of the offense). Under that scheme, we reviewed the district court's factual findings for clear error. Id. at 1289.

Everything changed, however, with the Supreme Court's decision in Apprendi v. New Jersey, 530 U.S. 466 (2000). There, the Court held that "[o]ther than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." Id. at 490. In Blakely v. Washington, 542 U.S. 296, 303–04 (2004), the Court clarified that "the relevant 'statutory maximum' is not the maximum sentence a judge may impose after finding additional facts, but the maximum he may impose *without* any additional findings." Apprendi and Blakely did not put an end to judicial fact-finding in sentencing. For one thing, the Court held in Harris v. United States, 536 U.S. 545, 568 (2002), that Apprendi did not apply to mandatory minimum sentences. Thus, judges could make factual findings relevant to statutory minimums by a preponderance of the evidence as long as the minimum was "[w]ithin the range authorized by the jury's verdict." Id. at 567. See Spero v. United States, 375 F.3d 1285, 1286 (11th Cir. 2004) (per curiam). For another, judges could determine facts relevant to the appropriate sentence under the United States Sentencing Guidelines, as long as those findings did not

12

take the sentence above the statutory maximum.  United States v. Booker, 543

U.S. 220, 233 (2005) ("[W]hen a trial judge exercises his discretion to select a

specific sentence within a defined range, the defendant has no right to a jury

determination of the facts that the judge deems relevant.").

Under the law as it stood during briefing and oral argument in this case, the

fact-finding duties were allocated as follows.  The jury had to find each element of

the § 841(a)(1) offense beyond a reasonable doubt.  The jury also had to find the

facts supporting the various § 841(b) enhancements beyond a reasonable doubt *if*

the court was going to impose a sentence above 20 years (the maximum for a

§ 841(a)(1) offense involving a Schedule I substance).  But if the court imposed a

sentence of 20 years or less, it could find by a preponderance the facts relevant to

a defendant's guideline range *and* the facts supporting a mandatory minimum,

such as the five- and ten-year minimums under § 841(b)(1)(B)(vii) and

(b)(1)(A)(vii).  Spero, 375 F.3d at 1286.

A week after oral argument in this case, the Supreme Court decided

Alleyne, which overruled Harris and held that "any fact that increases the

mandatory minimum is an 'element' that must be submitted to the jury."  Alleyne,

133 S. Ct. at 2155.  Because § 841(b)(1)(A) and (b)(1)(B) impose a mandatory

minimum, the drug quantities in those subsections are elements of the offense

13

under Alleyne and must be charged in the indictment and submitted to a jury. Happily for the Government, it submitted the sentencing facts to the jury even though Alleyne had not yet been decided. So this case does not raise any Apprendi concerns. But Alleyne does affect our standard of review, because we are reviewing the *jury*'s fact-finding, not the district court's. Accordingly, our task is to determine whether, viewing the evidence in the light most favorable to the Government, "a reasonable trier of fact could find that the evidence established guilt beyond a reasonable doubt." United States v. Williams, 527 F.3d 1235, 1244 (11th Cir. 2008) (quoting United States v. Calhoon, 97 F.3d 518, 523 (11th Cir. 1996)).

We can easily conclude that the evidence was sufficient for the jury to find Defendant conspired to possess 1,000 or more marijuana plants. To convict a defendant of conspiracy under 21 U.S.C. § 846, the Government must prove (1) an agreement existed between the defendant and at least one other person, (2) the defendant knew the object of the conspiracy and the object was illegal, and (3) the defendant knowingly and voluntarily participated in the conspiracy. United States v. Westry, 524 F.3d 1198, 1212 (11th Cir. 2008) (per curiam). The evidence did not need to show Defendant *himself* possessed 1,000 or more marijuana plants with intent to distribute. See Salinas v. United States, 522 U.S. 52, 63 (1997).

14

Instead, the Government only needed to prove Defendant joined a conspiracy that had the "object" of manufacturing or possessing with intent to distribute more than 1,000 marijuana plants. 21 U.S.C. § 846. "The partners in the criminal plan must agree to pursue the same criminal objective and may divide up the work, yet each is responsible for the acts of each other."[4] Salinas, 522 U.S. at 63–64 (citing Pinkerton v. United States, 328 U.S. 640, 646 (1946)).

Here, the jury heard that Defendant supervised six harvests at the Abdella and Van Camp houses. The testimony was fuzzy regarding whether this was six *total* harvests or six harvests at the Abdella house plus some harvests at Van Camp.[5] Either way, the jury heard that Defendant supervised one harvest of 240 to 250 plants, and at least five harvests of 190 plants each. So the Abdella and Van Camp houses produced at least 1,190 to 1,200 plants on Defendant's watch. When

_____

[4] In discussing Defendant's responsibility for the acts of his co-conspirators, the Government cites only the Sentencing Guidelines' definition of relevant conduct, which includes all acts Defendant "committed, aided, [or] abetted" during the conspiracy and "all reasonably foreseeable acts and omissions of others in furtherance of the jointly undertaken criminal activity." U.S.S.G. § 1B1.3(a)(1)(A), (B). The Guidelines' definition is, indeed, the proper standard for a district court to use in calculating a defendant's guideline range. But the Guidelines' standard is not the standard we use when reviewing the jury's finding that Defendant joined a conspiracy that had the goal of distributing 1,000 or more marijuana plants.

[5] Initially, Diaz testified that Defendant participated in "six" total harvests, including harvests at Abdella and Van Camp. Doc. 451 at 30–31. Later, however, Defendant's counsel asked Diaz, "So when you testified that there were six harvests allegedly at the Abdella home, the vast majority of those . . . would have been just the main house alone, not the garage?" Id. at 152–53. Diaz responded "exactly," without correcting counsel's assumption that he participated in six harvests at the Abdella house.

15

police executed a search warrant at the Abdella house, they found another 200 plants. Then there was Diaz's testimony that Defendant assisted with processing at least one harvest from the Everglades Boulevard house, which yielded about 200 plants. So the evidence showed Defendant was *directly* involved in growing more than 1,000 marijuana plants. This is without considering the many plants grown at the organization's other houses during Defendant's participation in the conspiracy.

As part of his sufficiency argument, Defendant raises a new argument that "the jury form improperly mixed and matched the number of plants sentencing enhancement with the weight of marijuana sentencing enhancement for Count 1." Appellant's Br. at 46. Defendant did not object to the jury verdict form below, so we review this newly-minted argument only for plain error. United States v. Mitchell, 146 F.3d 1338, 1342 (11th Cir. 1998). "In order to show plain error, a defendant must demonstrate that (1) error existed, (2) the error was plain, (3) the error affected his substantial rights, and (4) the error seriously affected the fairness, integrity or public reputation of judicial proceedings." United States v. Gandy, 710 F.3d 1234, 1240 (11th Cir. 2013) (per curiam).

Count 1, the conspiracy count, charged Defendant with conspiracy "to manufacture and possess with intent to distribute one thousand (1000) or more

16

marijuana plants, and to distribute and possess with intent to distribute one hundred (100) or more kilograms of . . . marijuana . . . ." Record, vol. 1 at 62. The jury verdict form, after asking if Defendant was guilty or not guilty, asked the jury to specify the number of plants and quantity of marijuana involved. The options for the number of marijuana plants were (1) 1,000 or more, (2) less than 1,000 but more than 100, and (3) less than 100. For the amount of marijuana, the options were (1) 100 kilograms or more and (2) less than 100 kilograms. The jury checked the boxes for "1000 or more marijuana plants" and "100 kilograms or more of marijuana." Record, vol. 2 at 342–43.

Defendant says the "verdict form improperly omitted the 1,000 kilograms or more jury question as was required under 21 U.S.C. § 841(b)(1)(A)(vii)." Appellant's Br. at 47. Defendant is correct that the Government "mixed and matched" statutory provisions. Id. at 46. Subsection (b)(1)(A)(vii) applies to either 1,000 kilograms of marijuana or 1,000 marijuana plants. And subsection (b)(1)(B)(vii) applies to 100 kilograms of marijuana or 100 marijuana plants. The indictment's conspiracy count borrowed from each subsection, charging 1,000 or more plants but only 100 kilograms. Charging two different penalty provisions (with different maximum and minimum sentences) in one count is certainly unusual. But Defendant has not shown us how the verdict form was "improper."

17

The verdict form required the jury to make individualized findings regarding the weight of marijuana and the number of plants. Because the jury found the conspiracy involved more than 1,000 marijuana plants, the higher statutory maximum and minimum were appropriate. The jury's finding that the conspiracy involved more than 100 kilograms of marijuana became essentially irrelevant and did not affect Defendant's sentence. So we can perceive no error, plain or otherwise.

Furthermore, the solution Defendant points to—including a "1,000 kilograms or more jury question"—would have changed nothing. Because the Government did not try to prove the conspiracy involved 1,000 or more kilograms, the jury likely would have checked exactly the same boxes it did.[6] So Defendant could not show prejudice, even if he could show a plain error.

### V.

Defendant next argues the translated transcripts of the wiretaps were improperly admitted. He renews the Confrontation Clause argument he made in the district court and to a lesser extent his objection that the transcripts lacked an evidentiary foundation.

---

[6] Diaz testified that four plants produced about a pound and a half of marijuana. Doc. 451 at 30. Thus, 1,000 plants would only yield about 375 pounds or 170 kilograms.

18

A.

Defendant's lack of foundation argument need not detain us long. This circuit has established a procedure for "challenging the accuracy of an English-language transcript of a conversation conducted in a foreign language." United States v. Le, 256 F.3d 1229, 1238 (11th Cir. 2001). If the parties cannot agree on a stipulated transcript, "then each side should produce its own version of a transcript or its own version of the disputed portions." Id. (quoting United States v. Cruz, 765 F.2d 1020, 1023 (11th Cir. 1985)). When a defendant does not avail himself of this procedure, he "waive[s] his right to challenge the translation and the transcripts." Id. Because Defendant did not produce any alternative transcripts, he has waived this argument.

Even if Defendant had preserved the argument, the Government adduced an adequate foundation for the transcripts. Under Federal Rule of Evidence 901(a), the proponent need only "produce evidence sufficient to support a finding that the item is what the proponent claims it is." Here, Diaz testified that he was fluent in both Spanish and English, was able to read both languages, had listened to the wiretap recordings, and believed the translated transcripts accurately reflected the recorded conversations. Because Diaz had himself been a party to each of the conversations, he was in an excellent position to authenticate the transcripts. See

19

United States v. Hogan, 986 F.2d 1364, 1376 (11th Cir. 1993) (finding no error when a party to a English-language conversation authenticated the transcripts). So Defendant's authentication argument cannot prevail.

B.

Defendant's failure to present his own transcripts did not waive his Confrontation Clause argument. See Bullcoming v. New Mexico, 131 S. Ct. 2705, 2718 (2011) (noting that the Government bears the burden of presenting its witnesses). We review a preserved Confrontation Clause claim *de novo*. United States v. Ignasiak, 667 F.3d 1217, 1227 (11th Cir. 2012). The Sixth Amendment provides, "In all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him . . . ." U.S. Const. amend. VI. In Crawford v. Washington, 541 U.S. 36, 59 (2004), the Supreme Court held that the Sixth Amendment permits the admission of "testimonial statements of witnesses absent from trial . . . only where the declarant is unavailable, and only where the defendant has had a prior opportunity to cross-examine." Testimonial statements include statements that are the "functional equivalent" of in-court testimony, such as affidavits, depositions, prior testimony and "statements that were made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial." Id. at 51–52. Thus, the

20

Court has held that the Confrontation Clause applies to a laboratory analyst's certification that a blood sample contained a certain blood alcohol content, Bullcoming, 131 S. Ct. at 2713, or that a substance contained cocaine, Melendez-Diaz v. Massachusetts, 557 U.S. 305, 310–11 (2009).

The Confrontation Clause only applies to "testimonial statements," specifically testimonial hearsay. Crawford, 541 U.S. at 53, 59. So to apply the Confrontation Clause to the transcripts in question, we must first identify in the transcripts a statement that is both testimonial and hearsay. We can first dispense with the idea that the original wiretapped conversations were testimonial hearsay. Even if the Government introduced Diaz's telephone conversations with Defendant and Herman Torres to prove the truth of the matters asserted, the three men had no reason to believe their conversations "would be available for use at a later trial."[7] Crawford, 541 U.S. at 52. Nor did the unidentified translator certify the accuracy of the transcripts in the way the analysts certified the laboratory results in Bullcoming or Melendez-Diaz. If the translator had, for example, certified that "the above English-language transcript is a true and accurate

---

[7] Additionally, Diaz's statements in the wiretapped conversations would be admissible because he "appear[ed] for cross-examination at trial," meaning "the Confrontation Clause places no constraints at all on the use of his prior testimonial statements." Crawford, 541 U.S. at 59 n.9. And *Defendant's* side of the conversations would not be hearsay, because a defendant's own admissions may be admitted against him without violating the Confrontation Clause. United States v. Brown, 441 F.3d 1330, 1358–59 (11th Cir. 2006).

21

translation of the conversations recorded in Government's exhibits 17 and 18," we would be faced with an obvious testimonial statement.  But here the transcripts contained no certification.

This means that the closest thing we have to a hearsay statement by the anonymous translator is the transcripts themselves.  But can a mere transcript of a conversation be a hearsay statement for Confrontation Clause purposes?  Insofar as the transcripts are simply English versions of Diaz's telephone conversations, they do not contain any hearsay statements *by the translator*.  The Confrontation Clause only applies to testimonial statements that are used to establish "the truth of the matter asserted."  Crawford, 541 U.S. at 59 n.9.  But the transcripts in this case did not contain any express "assertions" by the translator that could be true or false.  The translator's only assertion in the transcripts is his or her *implicit* statement that the translation was accurate.  That is, when the translator created the transcripts, he or she represented that each English word, phrase, or concept corresponded to the original Spanish word, phrase, or concept.

We recently concluded, for similar reasons, that an oral interpreter was "the declarant of the English-language statements" when a witness repeated the

22

interpreted conversation at trial.[8] United States v. Charles, — F.3d —, No. 12-14080, slip. op. at 10 (11th Cir., July 25, 2013). To limit the Confrontation Clause to express hearsay statements would allow the Government to skirt the Clause's requirements. We doubt the prosecution in Bullcoming or Melendez-Diaz could have avoided the Confrontation Clause simply by admitting the numeric or chemical results of the blood–alcohol or cocaine tests without an analyst's certification about how he arrived at those results. See Bullcoming, 131 S. Ct. at 2717 (concluding that allowing disallowing sworn statements but allowing unsworn statements "would make the right to confrontation easily erasable"); Williams v. Illinois, 132 S. Ct. 2221, 2276 (2012) (Kagan, J., dissenting) (observing the Bullcoming decision would not have allowed "the laboratory to file the selfsame report without the oath"). As the Court said in Melendez-Diaz, the certificates of analysis contained "the precise testimony the analysts would have been expected to provide if called at trial." Melendez-Diaz, 557 U.S. at 310. If,

---

[8] Although in Charles we did not discuss whether the translator's statements were explicit or implicit, we reasoned that the interpreter's statements were not the same as the original declarant's because interpretation "is the oral form of transferring meaning from one language . . . into another language." Charles, No. 12-14080, slip op. at 10. Of course, the only *assertions* that an interpreter makes relate to this process of transferring meaning. When an interpreter or translator renders the French "l'etat, c'est moi" into "I am the state," he is not asserting *he* is the state, but rather that "I am the state" is an accurate rendering of what the speaker (or Louis XIV) said. It is this added layer—the translator or interpreter's implicit assertions about the meaning of words—that make "the statements of the language interpreter and [the defendant] . . . not one and the same." Id. at 10.

23

instead of introducing the transcripts, the Government had called the translator to interpret the audio recordings to the jury, the testimony would have differed little from the transcripts. So the translator's implicit representation that the transcripts were correct qualifies as a hearsay statement for purposes of the Confrontation Clause.[9]

Next, of course, we must ask if this statement is testimonial. We do not know when or why the translator prepared the transcripts, but we would assume he or she did so with an eye toward trial. See Crawford, 541 U.S. at 51–52 (characterizing as testimonial "statements that were made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial"). Furthermore, although the Government's concession is not dispositive, see Gilbert v. United States, 640 F.3d

---

[9] Two of our sister circuits have applied the "language conduit" rule to conclude that an oral interpreter's statements are really statements of the speaker for purposes of the Confrontation Clause. United States v. Orm Hieng, 679 F.3d 1131, 1139 (9th Cir. 2012); United States v. Martinez-Gaytan, 213 F.3d 890 (5th Cir. 2000). "A defendant and an interpreter are treated as identical for testimonial purposes if the interpreter acted as a 'mere language conduit' or agent of the defendant." Orm Hieng, 679 F.3d at 1139 (quoting United States v. Nazemian, 948 F.2d 522, 528 (9th Cir. 1991). The factors for determining whether an interpreter is a language conduit include "which party supplied the interpreter, whether the interpreter had any motive to mislead or distort, the interpreter's qualifications and language skill, and whether actions taken subsequent to the conversation were consistent with the statements as translated." Id. (quoting Nazemian, 948 F.2d at 527). Although we have cited the language conduit rule with approval in the hearsay context, United States v. Alvarez, 755 F.2d 830, 860 (11th Cir. 1985), we recently held that it does not apply in the Confrontation Clause context. Charles, No. 12-14080, slip op. at 19.

24

1293, 1306 n.14 (11th Cir. 2011) (en banc), the Government conceded at oral argument that the transcript was testimonial.

Yet even if the translator made a testimonial statement out of court, the transcripts' admission did not violate the Confrontation Clause. The transcripts can only be testimonial to the extent they reflect the translator's statement (implicit here) that the English translation accurately reflects the Spanish conversation. Yet this is exactly what *Diaz*—a participant in the conversations—testified to based on his independent review of the recordings and transcripts. In fact, the anonymous translator's implicit statement was never admitted at trial. The only statement the jury heard regarding the transcripts' accuracy came from Diaz. Thus, even if the translator made a testimonial statement out of court, he or she did not become a "witness against" Defendant at trial.

Of course, the transcripts were the translator's work product, not Diaz's. But Diaz testified to his *own* judgment that the transcripts were accurate, not to the translator's judgment. That fact distinguishes this case from Melendez-Diaz and Bullcoming. In Melendez-Diaz, the state charged the defendant with distributing cocaine after he was arrested with several plastic bags that apparently contained cocaine. Melendez-Diaz, 557 U.S. at 308. At trial, the prosecution placed the

bags into evidence, along with three certificates of analysis stating the substance in the bags contained cocaine. Id. The Supreme Court held that the certificates, which had been sworn before a notary, "were testimonial statements, and the analysts were 'witnesses' for purposes of the Sixth Amendment." Id. at 311. Thus, admitting the certificates without allowing the analysts to be cross-examined violated the Confrontation Clause. Here, by contrast, the Government did not introduce the transcripts on the weight of the translator's certification, but on Diaz's testimony.

In Bullcoming, Curtis Caylor, a forensic analyst at the New Mexico Department of Health's Scientific Laboratory Division (SLD), tested a blood sample taken from the defendant upon his arrest for drunk driving. Bullcoming, 131 S. Ct. at 2710. Caylor signed a certificate of analysis stating that he had tested the blood with a gas chromatograph machine and had followed established procedures. Id. at 2710–11. The certificate reported a blood alcohol content well over the legal limit. Id. at 2710. At the defendant's trial, the state did not call Caylor. Id. at 2711–12. Instead, the state admitted the certificate of analysis through the testimony of another scientist, Gerasimos Razatos, "who had neither observed nor reviewed Caylor's analysis." Id. at 21712.

The New Mexico Supreme Court concluded Razatos's testimony sufficed because Razatos was an expert "with respect to the gas chromatograph machine and the SLD's laboratory procedures." Id. at 2716 (quoting State v. Bullcoming, 226 P.3d 1, 9 (N.M. 2010)). The United States Supreme Court rejected this argument. Razatos had no firsthand knowledge of several facts contained in Caylor's certification, including that the blood sample seal was unbroken and that Caylor adhered to precise testing protocols. Id. at 2714. The Court said the Sixth Amendment "does not tolerate dispensing with confrontation simply because the court believes that questioning one witness about another's testimonial statements provides a fair enough opportunity for cross-examination." Id. at 2716.

Unlike Razatos in Bullcoming, Diaz did not testify regarding the first translator's expertise or adherence to proper protocols. Instead, he testified that he had independently confirmed the transcripts' accuracy. This is exactly what Razatos was unable to do. The Court in Bullcoming said, "New Mexico could have avoided any Confrontation Clause problem by asking Razatos to retest the sample, and then testify to the results of his retest rather than to the results of a test he did not conduct or observe." Bullcoming, 131 S. Ct. at 2718. Diaz conducted the equivalent of a "retest" in this case. He testified he had listened to the

27

recordings, reviewed the transcripts, and believed the transcripts to be accurate reflections of the recordings. See Doc. 450 at 126–27.

To be sure, Diaz did not start from scratch in translating the conversations. So it was not a retest in the sense that a new blood test would be. But Diaz did not need to sit down with pencil and paper and start the translation process anew. Just because the translator worked on the transcript did not taint it constitutionally. In Melendez-Diaz, the Court said, "[W]e do not hold, and it is not the case, that anyone whose testimony may be relevant in establishing the chain of custody, authenticity of the sample, or accuracy of the testing device, must appear in person as part of the prosecution's case." Melendez-Diaz, 557 U.S. at 311 n.1. Rather, "what testimony *is* introduced must (if the defendant objects) be introduced live." Id. Diaz's live testimony was the *only* statement introduced to support the transcript's accuracy. Furthermore, his testimony was based on firsthand comparison of the recordings and the transcripts. See Bullcoming, 131 S. Ct. at 2722 (Sotomayor, concurring) ("[T]his is not a case in which the person testifying is a supervisor, reviewer, or someone else with a personal . . . connection to the scientific test at issue."). So the only testimony introduced to support the transcripts was "introduced live."

28

Defendant, of course, objects that Diaz was unqualified to testify regarding the transcripts' accuracy. But that is a question wholly independent from the Confrontation Clause. The Confrontation Clause makes no distinction between accurate and inaccurate testimony; it only insists that testimony be subject to cross-examination. Crawford, 541 U.S. at 61 ("[The Confrontation Clause] commands, not that evidence be reliable, but that the reliability be assessed in a particular manner: by testing in the crucible of cross-examination."). Nothing prevented Defendant from vigorously cross-examining Defendant regarding his language expertise, his biases, and the translation's accuracy. This is no more and no less than Defendant could have done if the original translator had taken the stand.

The conclusion we reach today is similar to the one we reached in an unpublished opinion, United States v. Sardinas, 386 F. App'x 927 (11th Cir. 2010) (unpublished). There, the Government introduced both audio and video recordings of various conversations conducted in Spanish. Id. at 941. The Government also introduced transcripts containing the Spanish original alongside an English translation. Id. Transcribers working for the drug task force initially prepared the transcripts, but a bilingual agent, Agent Checo, listened to the recordings, made corrections, and had the final word on the content of the

29

transcripts.  Id.  Agent Checo testified at trial.  Id. at 942.  Reviewing the Confrontation Clause issue for plain error, we rejected the defendant's argument that the original transcribers needed to testify.  Id. at 942.  We concluded that "even assuming the transcripts fall into the 'core class of testimonial statements' under Crawford and Melendez-Diaz," the defendant had shown no error.  Id.  We said, "Agent Checo, who reviewed the recordings himself, had the ultimate say over the content of the transcripts, making him the final translator.  He is thus the witness against [the defendant] for Confrontation Clause purposes."  Id.  In this case, Diaz was not actively involved in the production of the final transcript in the way Agent Checo was in Sardinas.  But, like Agent Checo, Diaz testified to the accuracy of the transcripts and was subject to cross-examination.  And—let us not forget—Diaz was a party to the transcribed conversations, meaning he was in a *better* position than anyone else to know what was actually said (and meant) in the conversations.

Our recent decision in United States v. Charles does not affect the outcome in this case.  In Charles, the Government charged the defendant, a Haitian national, with using a fraudulently altered travel document.  Charles, No. 12-14080, slip op. at 2.  A Customs and Border Protection (CBP) officer interviewed the defendant with the assistance of an over-the-phone Creole interpreter.  Id. at 3.

30

At trial, the officer testified to what the defendant said in the interview, though the officer was really testifying to what the interpreter said.  Id.  The Government did not call the interpreter as a witness.  Id. at 4.  We concluded the interpreter made out-of-court testimonial statements when she conveyed in English what the defendant said in Creole.  Id. at 9–10.  We said, "[G]iven the nature of language interpretation, the statements of the language interpreter and [the defendant] are not one and the same."  Id. at 10.  We concluded the Confrontation Clause required the interpreter to be subject to cross-examination at trial.  Id. at 23–24.  But because the defendant only raised the Confrontation Clause on appeal, our review in Charles was only for plain error.  Id. at 5.  We held the error was not plain because of the absence of binding precedent "clearly articulating that the declarant of the statements testified to by the CBP officer is the language interpreter."  Id. at 24.

The present case differs from Charles in one important respect.  The CBP officer in Charles testified to out-of-court statements made by the interpreter.  Here, by contrast, Diaz never even mentioned the anonymous translator.  Rather, he testified regarding his own assessment that the transcripts were accurate translations.  In short, because Diaz, not the original translator, was the "witness[]

31

against" Defendant under the Sixth Amendment, the admission of the transcripts through Diaz's testimony did not violate the Confrontation Clause.

## VI.

Finally, Defendant argues the district court erred when it denied his request to submit the forfeiture allegations to a jury. Federal Rule of Criminal Procedure 32.2 governs criminal forfeiture actions. The Government argues the rule does not give Defendant a right to a jury determination of the forfeitability of a money judgment as opposed to specific property. Because this question hinges on the proper interpretation of a procedural rule, our review is *de novo*. United States v. Beach, 113 F.3d 118, 189 (11th Cir. 1997).

Federal Rule of Criminal Procedure 32.2(b)(1)(A) says,

> If the government seeks forfeiture of specific property, the court must determine whether the government has established the requisite nexus between the property and the offense. If the government seeks a personal money judgment, the court must determine the amount of money that the defendant will be ordered to pay.

Subsection (b)(5) then says,

> (A) Retaining the Jury. In any case tried before a jury, if the indictment or information states that the government is seeking forfeiture, the court must determine before the jury begins deliberating whether either party requests that the jury be retained to determine the forfeitability of specific property if it returns a guilty verdict.

32

(B) Special Verdict Form. If a party timely requests to have the jury determine forfeiture, the government must submit a proposed Special Verdict Form listing each property subject to forfeiture and asking the jury to determine whether the government has established the requisite nexus between the property and the offense committed by the defendant.

Fed. R. Crim. P. 32.2(b)(5).

Although the rule's structure is somewhat confusing, its substance is not. Subsection (b)(1)(A) tasks the district court with two functions. First, the court "must determine . . . the requisite nexus between the property and the offense" for forfeiture of specific property. Second, the court must "determine the amount of money" for a money judgment forfeiture. Clear enough so far. But then Subsection (b)(5) creates an exception in jury cases. In cases, "tried before a jury," the district court's initial task is to "determine . . . whether either party requests that the jury be retained to determine the forfeitability of specific property . . . ." Fed. R. Crim. P. 32.2(b)(5)(A). If neither party makes such a request, the district court will do the fact-finding for both specific property and money judgment forfeitures. But if a party requests that a jury determine the forfeitability of *specific property*, the district court must submit that question to the jury by way of a special verdict form.

33

The rule says nothing about a jury determining the amount of a money judgment. By negative implication, a party is *not* entitled to a jury finding regarding a money judgment. Instead, "*the court* must determine the amount of money that the defendant will be ordered to pay." Fed. R. Crim. P. 32.2(b)(1)(A) (emphasis added). Defendant's argument ignores the negative implication canon, often expressed in the Latin phrase *expressio unius est exlusio alterius*. This canon applies where "items expressed are members of an associated group or series, justifying the inference that items not mentioned were excluded by deliberate choice, not inadvertence." Barnhart v. Peabody Coal Co., 537 U.S. 149, 168 (2003) (internal quotation marks omitted). The Rule's inclusion of both money judgments and specific property forfeitures in subsection (b)(1)(A) and its exclusion of money judgments in subsection (b)(5) was obviously deliberate. So we cannot read subsection (b)(5)'s jury procedures as applying to money judgments.

Our reading of the rule accords with precedent. We held in an unpublished opinion that Rule 32.2 does not create a right to a jury determination for money judgment forfeitures. United States v. Gray, 443 F. App'x 515, 523 (11th Cir. 2011) (rejecting the argument " that Federal Rule of Criminal Procedure 32.[2](b)(5) should be read to apply to personal money judgments"). The other

circuits to address the question have reached the same conclusion.  United States v. Phillips, 704 F.3d 754, 771 (9th Cir. 2012); United States v. Gregoire, 638 F.3d 962, 972 (8th Cir. 2011); United States v. Tedder, 403 F.3d 836, 841 (7th Cir. 2005).  Defendant cites only a footnote in a district court case , United States v. Gaskin, 2002 WL 459005 at *9 n.3 (W.D.N.Y. 2002), for the proposition that Rule 32.2 "gives the defendant the right to have the jury determine the forfeiture if the case was tried before a jury."  Appellant's Br. at 55.  Defendant misconstrues the case entirely.  In fact, the Gaskin said only that Rule 32.2 allows a jury determination for the "nexus between the offense and the *property* to be forfeited." Gaskin, 2002 WL 459005 at *9 n.3 (emphasis added).  This tells us nothing more than Rule 32.2 itself already did.  We remain persuaded that the court, not a jury, should determine the amount of a money judgment forfeiture.[10]

AFFIRMED.

---

[10] Defendant did not raise the Sixth Amendment, but we note that "the right to a jury verdict on forefeitability does not fall within the Sixth Amendment's constitutional protection." Libretti v. United States, 516 U.S. 29, 49 (1995).