[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 17-10300
Non-Argument Calendar

_____

D.C. Docket No. 5:16-cr-00153-SLB-SGC-1

UNITED STATES OF AMERICA,

Plaintiff - Appellee,

versus

BERNARD EUGENE MCKINNEY, II,

Defendant - Appellant.

_____

Appeal from the United States District Court
for the Northern District of Alabama

_____

(November 13, 2017)

Before HULL, JORDAN, and ROSENBAUM, Circuit Judges.

PER CURIAM:

Defendant Bernard McKinney appeals his convictions for bank fraud and

aggravated identity theft following a jury trial.  Specifically, McKinney contends

that the district court committed reversible error by admitting testimonial hearsay statements during trial in violation of the Sixth Amendment's Confrontation Clause and the Federal Rules of Evidence.  After thorough review, we affirm.

## I.  BACKGROUND

### A.    Check Cashing Scheme

During November 2014, defendant McKinney was involved in a fraudulent check cashing scheme in which McKinney and others cashed $89,000 in checks from a company, Transportation Services, that had its checking account with BBVA Compass.  These unauthorized checks appeared to have the signature of Transportation Services' office manager, Lesia McCarley, who was authorized to write checks on the company's behalf, but McCarley had not signed or authorized the checks.

McCarley identified six fraudulent checks.  These six fraudulent checks were actually counterfeits, as McCarley had the actual checks with the same check numbers still in her possession at the time she discovered the existence of the fraudulent checks.  On the six fraudulent checks, the payees were: (1) defendant McKinney on one, (2) Michael McNeil on one, (3) Mikael Freeman on two, and (4) Alexis Price on two.

At defendant McKinney's trial, McNeil testified that he cashed one fraudulent check for McKinney.  McKinney had rented space in McNeil's salon in

2

Huntsville, Alabama. McKinney owed McNeil money and paid McNeil using this fraudulent check payable to McNeil. Bank surveillance photos showed McNeil in Athens, Georgia cashing a check from Transportation Services made out to him on November 26, 2014. The check was for $9,747, but McKinney only owed McNeil $1,000. After McNeil cashed the check, he met McKinney who kept the difference.

Freeman, another payee, testified that he cashed two fraudulent checks for defendant McKinney and watched McKinney cash a third. McKinney and Freeman had been friends since college. McKinney introduced Freeman to someone named Cameron (later identified by law enforcement as Cameron Moran but referred to herein as "Cameron") who could pay Freeman for delivering documents. On November 24, 2014, McKinney, Cameron, and Freeman met up and drove together to a BBVA Compass branch in Huntsville. McKinney got out of the car, went in the bank, and returned to the car with an envelope full of cash. McKinney gave the cash to Cameron, who counted it and gave McKinney a portion. McKinney then gave Freeman $500.

Later that day, Freeman again met up with defendant McKinney and Cameron. Cameron had Freeman deliver a manila folder to someone at a gas station in Rome, Georgia.

3

The next day, November 25, defendant McKinney had Freeman return with McKinney and Cameron to the same BBVA Compass branch in Huntsville as the day before. Once there, Cameron gave Freeman a check for $9,673.25 written out to Freeman. Freeman cashed the check, returned to the car, and gave Cameron the money. Cameron counted it and gave some to McKinney and $1,000 to Freeman. The bank's video surveillance showed Freeman cashing the check.

On November 26, 2014, defendant McKinney called Freeman, who agreed to make another delivery of documents to Rome; this time delivering the documents to Cameron. Later that evening, Freeman met McKinney and Cameron near a BBVA Compass branch in Huntsville. Cameron gave Freeman another check to cash, which he did. This time, Cameron paid Freeman $900.

During the course of the government's investigation, Freeman called defendant McKinney in a recorded conversation, and McKinney admitted giving Freeman the checks but denied knowing that the checks were counterfeit.

Two of the counterfeit Transportation Services checks were payable to Alexis Price. Price, or at least someone using Price's driver's license, cashed the first check for $7,789.15 on November 26, 2014 at a BBVA Compass branch in Athens and cashed the second check for $8,475.35 on November 29, 2014 at a BBVA Compass branch in Beltline Decatur. Bank video surveillance showed the person identifying themselves as Price cashing the checks.

4

From November 24, 2014 through November 29, 2014, the time period during which these six checks were cashed, there were 53 phone calls between defendant McKinney and Cameron.  McKinney's phone records also demonstrated phone calls between McKinney and Price.

**B.    Defendant McKinney's Interviews with Law Enforcement**

At trial, United States Postal Inspector Roger Mayhew testified about two interviews he conducted with defendant McKinney during the course of investigating this fraudulent check cashing scheme.  At the beginning of both interviews Mayhew read McKinney the Miranda rights and informed McKinney that he was not under arrest and was free to leave.  In fact, McKinney, who agreed to speak with the investigators, was not under arrest or in custody.

In the first interview on January 22, 2015, which was not recorded, defendant McKinney admitted to recruiting three individuals to cash these Transportation Services checks and named "Alexis" as one of them.  Specifically, McKinney admitted to recruiting one young, black female with the first name Alexis.  McKinney stated that he went with Cameron and Alexis to cash a check in Athens.  McKinney later claimed that McNeil recruited Alexis.  McKinney also gave Inspector Mayhew contradictory stories about whether McKinney gave McNeil a check to cash, alternatively stating (1) that he did not know if McNeil got

5

a check, (2) that he gave McNeil a check, (3) that McNeil gave him a check, and (4) that McNeil got a check directly from Cameron.

On May 6, 2015, Inspector Mayhew again interviewed defendant McKinney. The jury watched the videotape of the interview and received a copy of the transcript.

During that second interview, defendant McKinney and Inspector Mayhew repeatedly discussed what connection, if any, McKinney had to Alexis Price. Mayhew pointed out to McKinney that the only female whose name is on any of these checks is Alexis Price, and McKinney responded: "I know, I don't know of her." Mayhew informed McKinney that he had interviewed Price and asked if McKinney had ever talked to her. McKinney claimed: "I never even spoke with her on that level. . . . On any level period." Mayhew then asked again if McKinney had ever talked to Price on the phone, to which McKinney responded: "I've heard of the girl. Like you know what I'm saying. Someone said that I knew her told what was going on." Mayhew and McKinney[1] then had the following exchange about whether McKinney recruited Price to cash the counterfeit checks:

> RM: So if she said you all met up at a club and you recruited her to cash this check. That's a lie?
>
> BM: Don't know the girl. Don't know the girl, don't know her. Don't know what she looks like

---

[1]Mayhew and McKinney are identified by their initials, "RM" and "BM" respectively, in the transcript.

RM: I'm just saying.  That didn't happen is what you're saying?

BM: I don't know her at all, at all

RM: Okay okay

BM: I'm just saying, I don't know the girl.  Don't know the girl, don't know her.  Don't know what she looks like

RM: I'm just saying. That didn't happen is what you're saying?

BM: I don't know her at all, at all.  I don't know her

Later in the interview, Inspector Mayhew asked defendant McKinney about

phone calls between McKinney and Price:

RM: Okay, Alexis Price.  The female.

BM: I don't deal with her at all.  Yeah So...

RM: Okay so.  Well there's phone call between you and Alexis Price on the day.

BM: I don't call her.

RM: Well your phone records say different.

BM: I don't know that girl like that.

        . . . .

RM: Okay your phone records say different that's why I'm giving you the opportunity.  It shows phone calls between you and her on November 26th of last year.  Multiple times.  It also shows that when she... At the time frames she was cashing one of these checks, by the way in Athens, your phone was just a little bit over a mile away.

BM: From the area?

RM: From the bank.  From the address of the bank.

7

BM: So you're telling me I was doing umm...

RM: I'm not telling you anything.  I'm just telling, I know where you were, and I know you were talking to her.  And I know what she did.  She cashed the check.  So that don't look good.  So I'm saying.  Did you ride with her?  Did Cam[eron] get you to ride with her over there kind of keep an eye on things.

BM: Basically used me as a dummy.  Basically.

RM: Well that might be but I need you to tell me the full truth so I can know he used you as a dummy.  So what'd he have you do with Alexis?

BM: He was with her.  He was with her and, but I'm giving them rides.  You know what I'm saying?

McKinney then admitted giving Cameron and Price a ride to Athens and dropping them off by a bank but denied writing or printing out the checks.

## C.    Procedural History

On May 25, 2016, a federal grand jury indictment charged defendant McKinney with six counts of bank fraud, in violation of 18 U.S.C. §§ 1344 and 2 (Counts 1-6), and two counts of aggravated identity theft, in violation of 18 U.S.C. §§ 1028A(a)(1), (2) and 2 (Counts 7-8).

On August 7, 2016, just prior to trial, the government gave notice that it intended to offer 404(b) evidence under the Federal Rules of Evidence, including defendant McKinney's recorded statement in which he admits to giving checks to other individuals and traveling to a bank with Price to cash a check.  While providing notice, the government maintained that these portions of McKinney's

recorded statement were not Rule 404(b) evidence because they were inextricably intertwined with the crime and were evidence of the fraud and McKinney's knowing participation in the fraud.  During trial, McKinney objected to admitting portions of the recorded statement on the basis that Price was effectively testifying through Inspector Mayhew's statements but could not be cross-examined because Price was not testifying.[2]

On August 10, 2016, after a three day trial, a jury convicted defendant McKinney of five counts of bank fraud (all but Count 2) and two counts of aggravated identity theft.

The district court sentenced defendant McKinney to a prison term of 12 months on each of Counts 1, 3, 4, 5, and 6, to be served concurrently, and a consecutive 24 months on each of Counts 7 and 8 (served concurrently with each other) for a total prison term of 36 months.

## II.  DISCUSSION

Defendant McKinney appeals the admission of the portions of his second interview with Inspector Mayhew related to Alexis Price as violating the Sixth

---

[2]Later at trial, the government indicated that Price would not be testifying because she had given birth a few days before, although the government did not know whether she had been discharged yet or what the latest information was.

Amendment's Confrontation Clause and as inadmissible hearsay.[3]

The Confrontation Clause of the Sixth Amendment provides: "In all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him." U.S. Const. amend. VI. The Sixth Amendment allows the admission of "[t]estimonial statements of witnesses absent from trial . . . only where the declarant is unavailable, and only where the defendant has had a prior opportunity to cross-examine." Crawford v. Washington, 541 U.S. 36, 59, 124 S. Ct. 1354, 1369 (2004). The "primary object" of the Sixth Amendment is to limit "testimonial hearsay." Id. at 53, 124 S. Ct. at 1365. Because the Confrontation Clause applies only to testimonial statements used to establish the truth of the matter asserted, our analysis under the Sixth Amendment and Crawford must determine whether the relevant statements were both testimonial and hearsay.[4] United States v. Curbelo, 726 F.3d 1260, 1272 (11th Cir. 2013); see also United States v. Charles, 722 F.3d 1319, 1328 n.10 (11th Cir. 2013) (instructing that "a proper Confrontation Clause analysis" requires determining "whether the declarant's statement is 'testimonial,' i.e. a declaration offered for the purpose of proving some fact to be used at trial" but that this inquiry is not coextensive with

---

[3]We review a district court's evidentiary rulings for an abuse of discretion but review a challenge to testimonial hearsay statements under the Confrontation Clause de novo. United States v. Caraballo, 595 F.3d 1214, 1226 (11th Cir. 2010).

[4]Generally, where the purpose of a police interrogation is not to meet an ongoing emergency, statements made during a police interrogation are testimonial. Michigan v. Bryant, 562 U.S. 344, 359, 131 S. Ct. 1143, 1156 (2011).

10

analyzing the challenged testimony under the Federal Rules of Evidence governing hearsay).

Federal Rule of Evidence 801(c) defines hearsay as "a statement that: (1) the declarant does not make while testifying at the current trial or hearing; and (2) a party offers in evidence to prove the truth of the matter asserted in the statement." Fed. R. Evid. 801(c).  Rule 802 generally prohibits the admission of hearsay evidence.  Fed. R. Evid. 802.

Only one statement in the recorded interview by Inspector Mayhew purportedly repeated statements made to him by Price.  That statement is: "So if she said you all met up at a club and you recruited her to cash this check.  That's a lie?"  This statement does not constitute testimonial hearsay because it is not used to establish the truth of the matter asserted.  Mayhew's questions throughout the interview were admitted only to provide context to McKinney's own inculpatory and contradictory statements about whether he even knew Price or was involved in the scheme.  Mayhew's statements only served to challenge McKinney's ever changing story and as necessary information to understand McKinney's responses. See United States v. Jiminez, 564 F.3d 1280, 1287 (11th Cir. 2009) ("But, if a trial court admits a statement, made by an available declarant whom the defendant has not had the opportunity to cross-examine, for a purpose other than for the truth of

the matter asserted, the admissibility of that statement does not violate the Confrontation Clause.").

Indeed, Inspector Mayhew's question about whether McKinney recruited Price at a club is phrased as a hypothetical and not an assertion of what Price actually said. There is no evidence in the record as to what Price actually told Mayhew. Mayhew's question is simply another way of asking defendant McKinney if he met up with Price at club and recruited her to cash a check, which would clearly not be testimonial or hearsay but merely a question asked during a law enforcement interview with a suspect.

Because the admitted statements were not testimonial hearsay offered to establish the truth of the matter asserted, it does not matter whether Price was available to testify or whether defendant McKinney had an opportunity to cross-examine Price. The statements by Inspector Mayhew in the second interview referring to Price and purportedly repeating her statements do not implicate the Confrontation Clause.

For the reasons discussed above, Inspector Mayhew's statements in the second interview referring to Price and her statements were not offered to prove the truth of the matter asserted in those statements and were thus not hearsay under Rule 801(c). Instead, they were offered to provide context to defendant McKinney's own statements, which included a confession that he drove Price and

12

Cameron to Athens to cash a fraudulent check.  The district court thus did not commit reversible error in allowing the admission of this evidence under the Federal Rules of Evidence.[5]

## III.  CONCLUSION

Based on the foregoing reasons, we affirm defendant McKinney's convictions.

**AFFIRMED.**

---

[5]We note that both McKinney's hearsay and Confrontation Clause arguments are subject to harmless error review.  United States v. Carter, 776 F.3d 1309, 1328 (11th Cir. 2015). Because the evidence of McKinney's guilt on all seven counts was overwhelming, we would find any alleged error here to be harmless.  See id.